211 So.2d 805

**John S. ODESS**

**v.**

**William H. TAYLOR, Jr.**

**6 Div. 471.**

Supreme Court of Alabama.

May 2, 1968.

Rehearing Denied June 20, 1968.

Edw. M. Selfe, Macbeth Wagnon, Jr., and Bradley, Arant, Rose & White, Birmingham, for appellant.

Max Pope, R. Clifford Fulford and Levine, Fulford, Gwaltney & Pope, Birmingham, for appellee.

PER CURIAM.

This appeal is from a decree entered after a hearing denying a permanent injunction to enjoin the respondent, an ear, nose, and throat specialist, from engaging in the practice of his profession in the City of Birmingham. Complainant's application for a temporary injunction had been refused, but no steps were taken to appeal from such order.

The pleadings and evidence show that the complainant, Dr. John S. Odess, is an established physician in Birmingham. He has been in the practice of medicine since 1946. His specialty is otolaryngology, a branch of medicine involving both medical and surgical diagnosis and treatment of ailments or diseases of the ear, nose, and throat. This specialty is commonly designated as ENT, and will often be so referred to hereafter.

That Dr. Odess is highly successful in his field is evidenced from his testimony that he has a patient list of some 25,000 persons. He sees from 60 to 70 patients per day in his office, and performs from 80 to 100 surgical procedures per month, and averages from 1000 to 1200 billings per month. His offices are in a building built and placed in a trust for the benefit of his children. Dr. Odess pays to this trust a rental of $14,400 per year.

For 1964, Dr. Odess' gross income from his medical practice was $265,997.91, his net income was $172,737.05; for 1965 his gross income was $291,947.18, his net income was $182,830.99; for 1966 his gross income was $271,257.10, his net income $173,833.25.

The respondent below was Dr. William H. Taylor, Jr. He received his medical

degree from the School of Medicine of the University of Alabama in 1957. He did his internship in a Florida hospital and then entered the Army Medical Corps for four years. After completing his military service he did a year of general surgery in the Duvall County Hospital, Jacksonville, Florida. Having done some ENT work in the army, Dr. Taylor determined to take a residency in the University Medical Center in Birmingham to further his training in that field. Here he had one year of general surgery and three years of ENT work, serving under Dr. James J. Hicks, acting head of the ENT department in the University Medical Center.

Shortly prior to March 1966, Dr. Odess and Dr. Taylor held a conversation relative to Dr. Taylor entering practice with Dr. Odess. This conversation resulted in an exchange of letters and these letters constitute the contract between Dr. Odess and Dr. Taylor.

Dr. Odess' letter to Dr. Taylor, dated March 11, 1966, is as follows:

"I am writing this letter at your request relative to our recent conversation.

"It was my understanding that our agreement was as follows: We will enter into the association for the practice of Ear, Nose and Throat on July 1, 1966. For a period of twelve (12) months your remuneration will be twenty five thousand dollars ($25,000). At the end of this time we will evaluate your productivity and for the next six months you will be paid on the basis of the percentage of the gross product you have produced.

"After eighteen (18) months have passed, Dr. Andrew Brown will have been in the office for approximately six (6) months and at that time the three of us will sit down and arrive at a financial basis relative to each of our gross. As our gross product approaches equality, then a full salary adjustment can be realized.

"It was further agreed that, if for some reason, our association does not work, then either of us may give one month's notice and terminate our association. If a termination such as this occurs, then it was further agreed that you would not practice within a radius of fifty (50) miles of Birmingham, Alabama. The purpose of this is that when you become associated with us I would expose the whole weight of my practice to you and if you were to leave me I would not want my practice damaged by your remaining within the fifty mile radius.

"If there are any additions or corrections to this agreement, please don't hesitate to let me know."

Dr. Taylor on 8 July 1966, replied:

"I am writing this letter in response to your letter of March 11, 1966.

"I find the terms as stated in your letter relative to entering into the association for the practice of Ear, Nose and Throat quite agreeable and acceptable.

"Thank you very much."

Dr. Taylor entered practice with Dr. Odess around 1 July 1966. After some three months upon examining the books, Dr. Taylor found that under the data processing records for work done and fees earned, credit was being given to Dr. Odess that should have been credited to him; that the less remunerative Crippled Children's Clinic work was being assigned to and handled almost exclusively by himself (Dr. Taylor), and that expenses such as "gifts," "entertainment" and "auto expense," etc., which Dr. Taylor considered out of line, were being charged against the gross earnings.

Dr. Taylor made efforts to discuss these matters with Dr. Odess, but was not successful. These matters of course would bear upon Dr. Taylor's compensation for the six months following the first year of the association. Being unsuccessful in having

Dr. Odess discuss these matters, Dr. Taylor gave timely notice to Dr. Odess that he was joining the Norwood Clinic as head of its ENT department as of January 1967.

There is a divergence of testimony as to the number of patients that might change from Dr. Odess to Dr. Taylor. Dr. Odess estimated the number at not less than 100 nor more than 1000. Dr. Taylor testified he had seen about 30 patients in his first three months at Norwood Clinic whom he had seen at Dr. Odess' office. These patients were either people who knew him before he associated with Dr. Odess, or patients he had been actively treating post surgically in Dr. Odess' clinic, or people who had asked him to notify them of his new location

In this connection Dr. Taylor testified that when it became evident he could get no adjustment of the bookkeeping methods and that he would discontinue his association with Dr. Odess, he contacted the Jefferson County Medical Association and told them he was leaving Dr. Odess and requested advice as to his responsibility to the patients he had been seeing and treating. He was advised that he had a duty to such patients to notify them either orally or by mail of his intended move. Dr. Taylor did inform some 563 patients whom he was treating that he was joining Norwood Clinic, but assured them they would receive good treatment from Dr. Odess and that they had a right to change to Dr. Odess if they desired.

Dr. Odess testified that there are no "trade secrets" in the practice of medicine, that he felt he had taught Dr. Taylor some things, and also that he had learned some things from Dr. Taylor.

Again, as to the need for ENT specialists in Birmingham, the testimony is in dispute. Dr. Odess testified that according to the 1965 edition of "Red Book" which we take to be a directory of medical doctors by specialty, there are 26 ENT men listed as practicing in Birmingham, and that prob-ably two or three more who had recently entered the practice in Birmingham could be added.

On the other hand, Dr. T. M. Boulware, a practicing physician for some 37 years, and president of the Norwood Clinic, testified after the ENT specialist who preceded Dr. Taylor left the Norwood Clinic he had been unable to secure an ENT specialist to fill this position for some six months or until Dr. Taylor joined the clinic. Dr. Boulware further testified that Norwood Clinic is in need of three ENT specialists, but his efforts to fill this need have been unavailing.

Dr. James J. Hicks, who is acting chairman of the Department of Otolaryngology of the Medical College of the University of Alabama, and who also practices his specialty in Birmingham, testified that while he could not be sure, as he had not checked lately, he thought there were 12 or 13 ENT specialists practicing in Jefferson County, and the need for these specialists in Jefferson is not met. In fact he was presently attempting to secure two of these specialists from England.

On cross examination, Dr. Hicks testified he had never seen the "Red Book" directory referred to in the testimony of Dr. Odess, and was not familiar with it.

In his final decree dismissing the cause, and taxing the costs on the complainant, the Chancellor found: (1) That the complainant failed to prove that he has, or will, suffer great and irreparable damages of a continuing nature for which he has no adequate remedy at law; (2) That to enjoin the respondent from engaging in practicing his profession in Jefferson County, Alabama, would be contrary to public policy and against the best interest of the public welfare of the general public, and (3) The agreement between the complainant and respondent is void under Section 22 of Title 9, Code of Alabama 1940.

The complainant-appellant has argued eight assignments of error. Assignments 1,

2, 3, 7, and 8 are general in nature to the effect that the court erred in entering its final decree and in dismissing the cause.

Assignment 4 alleges error relative to the finding of the court that the complainant-appellant had not, nor would, suffer irreparable damages for which he had no adequate remedy at law.

Assignment 5 asserts error in the court's finding that to enjoin the respondent-appellee from practicing medicine in Jefferson County, Alabama, would be contrary to the public welfare.

Assignment 6 asserts error in the court's finding that the agreement between complainant and respondent was void under the provisions of Section 22, Title 9, Code of Alabama 1940.

We shall first consider assignment 5, i. e., that the court erred in finding that to enjoin Dr. Taylor from practicing his profession in Jefferson County, Alabama, would be contrary to public policy and public welfare.

As a general rule an injunction, whether temporary or permanent, cannot be sought as a matter of right. The power to grant or refuse it rests in the sound discretion of the court under the facts of the particular case. 43 C.J.S. Injunctions § 14, p. 420; Pritchett v. Wade, 261 Ala. 156, 73 So.2d 533; Corte v. State, 259 Ala. 536, 67 So.2d 782.

In the exercise of discretion in the matter of granting or denying an injunction, one of the factors to be considered by a court is the effect of its action upon the interests of society as a whole. Particularly is this consideration present in considering contracts in restraint of exercising a lawful profession, business, or trade. Hill v. Rice, 259 Ala. 587, 67 So.2d 789; McCurry v. Gibson, 108 Ala. 451, 18 So. 806.

In Dr. Miles Medical Co. v. John D. Park and Sons, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502, it was stated in respect to the reasonableness of contracts in restraint of trade, "But the public interest is still the first consideration."

The testimony of Doctors Boulware and Hicks, if believed to the required degree, demonstrates the dire need of more ENT specialists in Jefferson County.

It is common knowledge that there is now an acute shortage of physicians and surgeons in Alabama, particularly in specialized fields of practice. One needs but to attempt to obtain an appointment with a medical practitioner to have this fact brought home.

Adapting the needs of the public to today's existing shortage of medical doctors necessitates the conclusion that the public in Jefferson County would suffer by removing a highly trained specialist from practicing his profession in that area.

We hold that under the facts of this case the lower court was justified in finding that it would be adverse to the public interest to enjoin the respondent from practicing his profession.

We are aware that there are many decisions to the effect that a physician may be enjoined from breaching a contract not to engage in his profession in a described area where such covenant is made in connection with the sale of his practice and equipment. See Annotation in 58 ALR, 157 et seq. Most of these cases were decided thirty, forty, or more years ago, at a time when there was an abundant number of physicians to fully meet the demands for their services. In the not too distant past there was one or more physicians in virtually every crossroads community in this state. Today, one in need of medical attention must seek medical help in urban communities.

Appellant places much reliance upon McCurry v. Gibson, 108 Ala. 451, 18 So. 806, decided in 1895. In said case one physician had purchased from a second physician, for the sum of $125.00, his horse, buggy, and

medical practice, the vendor agreeing in writing as a part of the contract, not to practice his profession in the City of Anniston for two years. Upon the vendor resuming the practice of medicine in Anniston within the proscribed period, a temporary injunction was issued prohibiting him from such endeavor, and on motion to dissolve the temporary injunction and after a hearing, the court refused to dissolve the temporary injunction and it was continued in force according to the prayer of the original bill. On appeal the decree of the lower court was affirmed.

A mere comparison of the facts of McCurry v. Gibson, supra, with the facts of the present case would suffice to establish the inapplicability of that case to the present one. No medical practice or property was transferred by Dr. Odess to Dr. Taylor as consideration for the contract. A more important distinction is that McCurry y. Gibson, supra, was decided more than three decades before the enactment of Sections 22 and 23, Title 9, Code of Alabama 1940, which sections relate to contracts in restraint of trade. The effect of these sections upon the present case will be discussed in our consideration of assignment of error No. 6.

Assignment of error No. 6 is to the effect that the lower court erred "in finding as a fact or concluding as a matter of law that the agreement between complainant (appellant) and respondent (appellee) * * * is void under Section 22 of Title 9 of the 1940 Code of Alabama (Recompiled in 1958) and does not come within the protection and purview of Sections 23 and 24 of the said Title 9."

These sections are as follows:

"§ 22. *Contract in restraint of trade, void.*—Every contract by which any one is restrained from exercising a lawful profession, trade, or business of any kind, otherwise than is provided by the next two sections, is to that extent, void.

\*     \*     \*     \*     \*     \*

"§ 23. *Exceptions in favor of purchaser of good will and employer.*—One who sells the good will of a business, may agree with the buyer, and one who is employed as an agent, servant, or employee may agree with his employer, to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof, so long as the buyer or any person deriving title to the good will from him, and so long as such employer carries on a like business therein.

\*     \*     \*     \*     \*     \*

"§ 24. *Exceptions in favor of partnership arrangements.*—Partners may, upon or in anticipation of a dissolution of the partnership, agree that none of them will carry on a similar business within the same county, city or town where the partnership business has been transacted, or within a specified part thereof."

Section 24 relates to partnerships. Under Dr. Odess' offer contained in his letter of March 11, 1966, the arrangement between Dr. Odess and Dr. Taylor was to be an "association" with Dr. Taylor to receive for the first twelve months a fixed salary, with no share in the profits of the "association." There was no provision that Dr. Taylor would be liable for any losses resulting from the "association." Division of profits, and liability for losses are essential elements of a partnership. Price v. Cox, 242 Ala. 568, 7 So.2d 288; Cox v. Fielding, 24 Ala.App. 68, 130 So. 164. The association between Dr. Odess and Dr. Taylor thus lacked the essential elements of a partnership.

Further, throughout his bill, it was the position of the complainant that Dr. Taylor was an "employee" of Dr. Odess.

For the above reasons Section 24, supra, is laid aside in our considerations.

Even a specific covenant not to compete in a profession, trade, or business

is void under Section 22, supra, unless within the limited exceptions created by Section 23, supra. Joseph v. Hopkins, 276 Ala. 18, 158 So.2d 660.

As pointed out in Parker v. Ebsco Industries, Inc., 282 Ala. 98, 209 So.2d 383, Section 23 originally applied only to the sale of the good will of a business (Section 6827, Code of 1923) but the section was amended in 1931 to extend to the relationship of employer and employee.

The question is thus presented as to whether the legislature intended by Section 23 that one practicing a profession should be considered in the category of an employee as that term is understood in the usual trade or commercial sense.

It is significant that the term "profession" is omitted in Section 23. Said section pertains to a "business" to an "agent, servant, or employee" and to soliciting old "customers" of a former "employer."

Having included "profession" in Section 22, and omitted this term in Section 23, an affirmative inference is created that the legislature did not intend to include professions in Section 23, such interpretation being aided by resort to the maxim "expressio unius est exclusio alterius." See Weill v. State ex rel. Gaillard, 250 Ala. 328, 34 So.2d 132; City of Birmingham v. Brown, 241 Ala. 203, 2 So.2d 305.

■ For one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished, or in other words, not only what shall be done, but how it shall be done. Weeks v. C. L. Dickert Lbr. Co., 270 Ala. 713, 121 So.2d 894.

The evidence shows beyond question that Dr. Taylor exercised his professional skill, independent of Dr. Odess while associated with him. It would be inconceivable that the practice of a profession with delicate and instantaneous decisions to be made, could be otherwise performed. The re-

lationship between doctor and patient, or lawyer and client is one of personal confidence. The patient or client is not a "customer." He has sought the services of his professional adviser because of reliance on the professional training, skill, experience, and integrity of his adviser. He does not contemplate his professional adviser will act only upon the directions of another.

No better statement of the difference between engaging in a profession, as distinguished from a trade or business, can be found than the following observation made by the late Dean Roscoe Pound in his work "The Lawyer from Antiquity to Modern Times," at pages 5 and 6:

"There is much more in a profession than a traditionally dignified calling.

"The term refers to a group of men pursuing a learned art as a common calling in the spirit of a public service—no less a public service because it may incidentally be a means of livelihood. Pursuit of the learned art is the purpose. Gaining a livelihood is incidental, whereas, in a business or trade it is the entire purpose. * * *"

■ We hold that the lower court correctly found that Section 23 does not apply to covenants restraining the practice of a profession, and that such contracts are void under Section 22, supra.

■ In this connection, we note that in the fairly recent case of Bergh v. Stephens, 175 So.2d 787, the Florida District Court of Appeals, First District, considered an employment contract between two physicians wherein one covenanted not to practice medicine for a period of five years within ten miles of the hospital wherein the two practiced in association. The Florida statute pertaining to contracts in restraint of trade are virtually identical with Sections 22 and 23 of our code. The Florida court held the restrictive covenant void in view of the statutory provision that every con-

tract by which anyone is restrained from exercising a lawful profession, trade or business is void. Florida likewise has provided a statutory exception to the above mentioned general provision which is in the almost identical language of our Section 23. The Florida court concludes, as have we, that the contract being considered was not saved by the exception to the general provision in that the exception did not apply to contracts relating to the practice of a profession.

The reasons set forth above fully support the decree here questioned. We see no need therefore in discussing the several other points argued pro and con in the briefs of respective counsel, and in the interest of brevity forego such discussion.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, MERRILL and HARWOOD, JJ., concur.