**J.E. HANGER, INC., Plaintiff,**

v.

**Richard C. SCUSSEL, Defendant.**

**Civil Action No. 96–C–901–S.**

United States District Court,
M.D. Alabama,
Southern Division.

July 30, 1996.

---

## MEMORANDUM OPINION

CARROLL, United States Magistrate Judge.

### INTRODUCTION AND PROCEDURAL HISTORY

This cause is before the court on the Application for Preliminary Injunctive Relief filed by the plaintiff, J.E. Hanger (Hanger), on May 30, 1996.[1] Hanger alleges that the defendant, Richard Scussel (Scussel), a former employee of Hanger, engaged in activities "competitive with Hanger" and solicited Hanger customers and employees, contrary to the terms of his Employment Agreement. In addition, Hanger claims that Scussel "used, modified or adapted" trade secrets and confidential information in violation of his employment contract.

In response, Scussel filed a Partial Motion to Dismiss Plaintiff's Complaint for Injunctive Relief on June 14, 1996. He claims that his contract is unenforceable. The court held a hearing on the matter on June 16, 1996.

### FACTS

The plaintiff, J.E. Hanger, engages in the business of selling, servicing, fabricating, and fitting prosthetic and orthotic devices throughout the United States. The defendant, Richard Scussel, is the former Branch Manager for Hanger's Dothan, Alabama, office. As Branch Manager, Scussel had numerous responsibilities. Among other duties, he manufactured, sold, and serviced orthotic and prosthetic devices; selected, trained, and assigned personnel at the Dothan facility; developed contacts within the medical community in and around Dothan in order to create and maintain good will and obtain referral sources[2]; promoted prosthetic and orthotic products and devices; and provided overall management of the Dothan facility.

On June 29, 1993, Scussel entered into an Employment Agreement with Hanger which states, in pertinent part:

Lisa H. Cassilly, Randall D. Grayson, Alston & Bird, Atlanta, GA, Alan Carpenter Livingston, Lee & McInish, Dothan, AL, for plaintiff.

Gary Clayborn Sherrer, Farmer, Farmer, Malone & Sherrer, P.A., Dothan, AL, James C. Clark, Jr., Russell E. Hinds, Page, Scrantom, Sprouse, Tucker & Ford, P.C., Columbus, GA, for defendant.

1. Hanger also filed a Motion for Temporary Restraining Order which was denied by the District Court on June 4, 1996.

2. A referral source is a person who sends customers to Hanger, such as a doctor, nurse, insurance company, or physical therapist.

## V. *PROPRIETARY INFORMATION AND INVENTIONS*

Employee acknowledges that in the course of his employment by the Company he will receive and participate in the creation of certain trade secrets, inventions, programs, lists of customers and other confidential information and knowledge concerning the Company and its operations. Accordingly, Employee agrees to be bound by the loyalty covenants and covenants in this Agreement restricting disclosure of confidential information and trade secrets.

## VI. *CONFIDENTIAL INFORMATION AND TRADE SECRETS*

For purposes of this Agreement, the following definitions apply: "Trade Secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula or improvement that is valuable and secret (in the sense it is not generally known to competitors of the Company). To the extent consistent with the foregoing, trade secrets include (without limitation) specialized information and technology that provide the Company or its affiliates an advantage over their competitors in the manufacture, servicing, or sale of prosthetic and orthotic devices.

"Confidential Information" means any data or information, other than trade secrets, that is material to the Company or its affiliates and not generally known by the public. To the extent consistent with the foregoing, confidential information includes (without limitation): cost data (such as labor or material costs pertaining to the purchase and servicing of prosthetic and orthotic devices): data relating to the Company's operations; the identity and location of manufacturers selling prosthetic and orthotic devices to the Company and its affiliates, and the purchase terms (including prices) negotiated by the Company and its affiliates with such vendors; data relating to sales volume by customer, location, or product category, customer lists; financial information that has not been released to the public by the Company or its affiliates; future business plans, marketing strategies and advertising campaigns. In order to protect the trade secrets and confidential information of the Company and its affiliates, and in order to provide the Company with a basis for granting the Employee access to such trade secrets and confidential information, the Employee agrees as follows:

a) *Trade Secrets.* During the period of his employment with the Company, and for so long afterwards as the pertinent ideas and information remain trade secrets, the Employee will not disclose to anyone, and will not use, modify, or adapt (except as required in the course of performing his duties for the Company) any trade secrets of the Company or its affiliates without first obtaining the Company's written consent.

b) *Confidential Information.* During the period of his employment with the Company, and for two (2) years thereafter, the Employee will not disclose to anyone, and will not use, modify, or adapt (except as required in the course of performing his duties for the Company) any confidential information of the Company or its affiliates without first obtaining the Company's written consent.

c) *Independent Obligations.* Employee agrees that his obligation not to use or disclose the trade secrets or confidential information of the Company and its affiliates shall survive termination of his employment with the Company for the period of time specified in this section, regardless of the grounds for such termination, that the obligations contained in each of subsections (a) and (b), are separate and independent from each other and all other obligations in this Agreement, and any failure by the Company to perform its obligations under any other section of this Agreement shall not be a defense to the enforcement by the Company of the obligations contained in subsections (a) and (b).

## VII. *LOYALTY COVENANTS*

Employee acknowledges that he owes the highest duty of loyalty to the Company. In recognition of this loyalty and in order to encourage the Company to have

confidence in him and to provide him responsibility to act on behalf of the Company, Employee agrees as follows:

(a) *Non–Compete.* For so long as Employee is employed by the Company, and for a period of two (2) years thereafter, Employee shall not, within a fifty (50) mile radius of Company's office at [Wesley Way, Dothan] compete against the Company by engaging as principal, agent, employee, trustee, or through the agency of any corporation, partnership, association, or individual in the manufacture, sale, or servicing of prosthetic or orthotic devices.

(b) *Non–Solicitation of Employees.* So long as Employee is employed by the Company, and for a period of two (2) years thereafter, Employee shall not, within a fifty (50) mile radius of the Company's office at [Wesley Way, Dothan] solicit any person employed by the Company to leave the employ of the Company, or to accept employment with Employee or with an y person, firm, partnership, association, or corporation with whom Employee may then be associated.

(c) *Non–Solicitation of Customers and Referral Sources for Customers.* For so long as Employee is employed by the Company, and for a period of two (2) years thereafter, Employee shall not, within a fifty (50) mile radius of the Company's office at [Wesley Way, Dothan], solicit any customer of the Company, or referral sources for customers, including but not limited to physicians, physical therapists, clinics or hospitals, with whom the Employee had any business dealings or contacts on behalf of the Company within two (2) years prior to termination of employment.

(d) *Independent Obligations.* Employee agrees that his obligations under this section shall survive termination of his employment regardless of the grounds for termination, and that the obligations contained in each of sub-sections (a), (b), and (c) are separate and independent from each other, and from all other obligations in this Agreement. Any failure by the Company to perform its obligations under any other section of this Agreement shall not be a defense to the enforcement by the Company of the obligations contained in each of sub-sections (a), (b), and (c).

As stated above, Hanger alleges that Scussel is violating these contractual obligations. Scussel, in turn, claims that the contract is unenforceable.

## DISCUSSION

■ To grant a preliminary injunction, a court need not find that the evidence positively guarantees a final verdict in the plaintiff's favor. Instead, it must determine whether the plaintiff has met its burden of demonstrating that: (1) there is a substantial likelihood that it will prevail on the merits; (2) irreparable injury will occur unless an injunction is issued; (3) the potential harm it faces if relief is not granted outweighs the harm that will occur to the parties against whom the injunction is issued; and (4) the injunction, if issued, will not disserve the public interest. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.,* 51 F.3d 982 (11th Cir.1995).

■ As stated above, Hanger alleged that Scussel violated his contract in two ways: first by unlawfully competing against Hanger and second by potentially using Hanger's trade secrets. The law requires that "noncompetition prohibitions concerning employment and customer solicitation must be analyzed separately from those concerning disclosure of confidential business information...." *Sunstates Refrigerated Services, Inc. v. Griffin,* 215 Ga.App. 61, 449 S.E.2d 858 (Ga.App.1994) (citing *Wiley v. Royal Cup, Inc.,* 258 Ga. 357, 370 S.E.2d 744 (Ga. 1988)).[3] Therefore, the court will first address the preliminary injunction issue with respect to the noncompetition covenants. Once that analysis is complete, the court will then address the preliminary injunction issue with respect to the trade secret clauses.

---

**3.** The court explains in detail below why Georgia law is used to determine the substantive contractual issues in this case.

# 1552

## NONCOMPETITION COVENANTS

### A. Substantial Likelihood of Success on the Merits

 To satisfy the first prong—likelihood of prevailing on the merits—Hanger has the burden of establishing that the restrictive covenant contained in Scussel's contract is enforceable. *Hekimian Laboratories, Inc. v. Domain Systems, Inc.*, 664 F.Supp. 493 (S.D.Fla.1987). The contract between Hanger and Scussel provides, and both parties agree, that its validity is to be determined in accordance with Georgia law. Georgia law disfavors covenants tending to limit competition. "By both constitutional and legislative provision, Georgia prohibits contracts or agreements in general restraint of trade." *Howard Schultz & Associates of the Southeast, Inc. v. Broniec*, 239 Ga. 181, 236 S.E.2d 265, 267 (Ga.1977); 1983 Ga. Const. art. III, § 6, P 5; Ga.Code Ann. § 13–8–2 (Michie 1982);[4] *see also Orkin Exterminating Co. Inc. v. Martin Co.*, 240 Ga. 662, 242 S.E.2d 135, 138–39 (Ga.1978) ("overly-restrictive covenants in employment contracts ... which place a restraint upon the free movement of employees in the marketplace as opportunity, experience and competition permits is contrary to this court's view of fair competition"). This prohibition, however, is not absolute. Covenants against competition contained in employment agreements may be upheld if reasonable as to time and place, and if not over broad as to the activities proscribed. *Durham v. Stand–By Labor of Georgia, Inc.*, 230 Ga. 558, 198 S.E.2d 145, 148 (Ga.1973); *W.R. Grace & Co., Dearborn Div. v. Mouyal*, 262 Ga. 464, 465, 422 S.E.2d 529 (Ga.1992) (a three-element test of duration, territorial coverage, and scope of activity has evolved as a "helpful tool" in examining the reasonableness of the particular factual setting to which it is applied). "Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the

parties, and all the other circumstances." *Id.* (citations omitted).

Scussel supports his argument that the contract is unenforceable in three ways. First, he claims that the contract is over broad as to the activities it proscribes. Next, he contends that the case *Vortex Protective Service, Inc. v. Dempsey*, 218 Ga.App. 763, 463 S.E.2d 67 (Ga.App.1995) is directly on point in his favor. Finally, he claims that Hanger has "unclean hands."

### 1. Overbreadth

 Scussel argues that the covenant against competition found in his Employment Agreement with Hanger is unenforceable because it "essentially restrict[s] [his activities] against competition in any capacity." The part of the Agreement to which he refers is:

(a) *Non–Compete.* For so long as Employee is employed by the Company, and for a period of two (2) years thereafter, Employee shall not, within a fifty (50) mile radius of Company's office at [Wesley Way, Dothan] compete against the Company *by engaging as principal, agent, employee, trustee, or through the agency of any corporation, partnership, association, or individual in the manufacture, sale, or servicing of prosthetic or orthotic devices.*

(emphasis added). The Georgia courts have long held that "a contract which prohibits an employee from working for any competitor in any capacity 'fails to specify with particularity the activities which the employee is prohibited from performing and is therefore too indefinite to be enforceable.'" *Nationwide Advertising Service, Inc. v. Thompson Recruitment Advertising, Inc.*, 183 Ga.App. 678, 359 S.E.2d 737 (Ga.App.1987) (quoting *McNeal Group Inc. v. Restivo*, 252 Ga. 112, 311 S.E.2d 831 (Ga.1984)); *Uni–Worth Enterprises Inc. v. Wilson*, 244 Ga. 636, 261 S.E.2d 572 (Ga.1979).

 In this case, the court finds that this covenant does not restrict Scussel's activities "in any capacity." "In any capacity" provi-

---

4. Art. 3, § 6, P 5 of the Georgia constitution forbids the legislature from authorizing "any contract ... which may have the effect of ... defeating or lessening competition." § 13–8–2 of the Georgia Annotated Code deems unenforceable as contrary to public policy all contracts in "general restraint of trade."

sions are over broad and thus unenforceable because they "impose a greater limitation upon the employee than is necessary for the protection of the employer." *Restivo,* 311 S.E.2d 831 (1984). In this case, the covenant restricts only some of the activities which could hurt Hanger. The covenant restricts Scussel from the "manufacture, sale, or servicing of prosthetic or orthotic devices" only. He is still able to perform other functions. In *Puritan/Churchill Chemical Co. v. Eubank,* 245 Ga. 334, 265 S.E.2d 16 (Ga. 1980), appellee was a specialty salesman for appellant. The restrictive covenant in his employment contract read, in relevant part, as follows: "Representative does expressly covenant and agree that ... he will not ... 3. Own, manage, control, operate or participate in the ownership, management, or control, or engage as a sales representative or sales executive, of any business which engages in any phase of the business described...." *Id.* at 335, 265 S.E.2d 16. The Supreme Court held that the limitations on Eubank's activities were "unreasonable considering the business interest of [his former employer] sought to be protected." *Id.* The court continued,

> Eubank worked only as a salesman.... However, the restrictive covenants at issue prevent him from owning, managing, controlling, operating, or even participating in owning, managing or controlling any business which is in competition with Puritan. [L]anguage which restricts employees from activities in a much more limited fashion than is necessary for the protection of the employer will not withstand the reasonableness test so as to uphold the covenant.

*Id.* (Citations omitted). In this case, the language of the covenant does not restrict more activities than Scussel actually performed at his job. It does not limit more activities than is necessary for the protection of Hanger.

In addition, and more importantly, this covenant does not restrict Scussel's activities "in any capacity." Covenants which are held to be unenforceable for overbreadth of restricted activities prevent the employee from working in any capacity—even as a "book-

keeper, secretary, or filing clerk"—and are therefore seen as unreasonable. *See National Settlement Associates of Georgia, Inc. v. Creel,* 256 Ga. 329, 349 S.E.2d 177 (Ga.1986) (covenant "would prohibit Creel from being employed even in a capacity such as a bookkeeper or filing clerk by a competitor of NSA, and consequently is unreasonable considering the business interest sought to be protected"); *Dunn v. Frank Miller Associates, Inc.,* 237 Ga. 266, 227 S.E.2d 243 (Ga. 1976) (covenant "would prohibit appellant from being employed as a bookkeeper, secretary, or filing clerk by a competitor. The contract, therefore, is unreasonable as imposing greater limitations on the employee than were necessary for the protection of the employer"). In this case, the covenant restricts those narrowly-defined activities which are necessary for the protection of Hanger. Thus, the covenant is reasonable as to the activities which it prohibits.

**2. Vortex**

■ In *Vortex Protective Service v. Dempsey,* 218 Ga.App. 763, 463 S.E.2d 67 (Ga.App. 1995), the court held that " 'a prohibition against doing business with *any* of an employer's customers, whether or not a relationship existed between the customer and the former employee, is over broad.' " *Id.* at 766, 463 S.E.2d 67 (quoting *W.R. Grace, etc. v. Mouyal,* 262 Ga. 464, 467(2) n. 2, 422 S.E.2d 529 (Ga.1992)). The court held the noncompetition covenant in *Vortex* unenforceable because "it prohibits not only solicitation of prospective customers, regardless of whether they are former Vortex customers but would also prohibit acceptance of requests for ... business from former Vortex customers, regardless of who initiated the contact and request." *Id.* at 767, 463 S.E.2d 67. Scussel argues that the covenant in *Vortex* is virtually identical to the one in this case, and therefore the covenant in this case must fail. The court does not agree.

The covenant in *Vortex* stated, in pertinent part,

> I will not ... enter into or engage generally in direct competition with the Employer in the business of selling, leasing, installing or servicing burglar alarm, fire detection

or other security systems of a type which would be in direct competition with those marketed and serviced by the Employer at the time of my termination....

*Id.* at 763, 463 S.E.2d 67. Scussel is correct in pointing out that the covenant in this case states, "Employee shall not ... compete against the Company by engaging ... in the manufacture, sale, or servicing of prosthetic or orthotic devices." However, what Scussel does not mention is that, unlike the covenant in *Vortex,* the covenant in this case also states,

> (c) *Non–Solicitation of Customers and Referral Sources for Customers.* For so long as Employee is employed by the Company, and for a period of two (2) years thereafter, Employee shall not, within a fifty (50) mile radius of the Company's office at [Wesley Way, Dothan], solicit any customer of the Company, or referral sources for customers, including but not limited to physicians, physical therapists, clinics or hospitals, with whom the Employee had any business dealings or contacts on behalf of the Company within two (2) years prior to termination of employment.

This part of the covenant between Hanger and Scussel deals with and satisfactorily resolves the problem in *Vortex.* In *Vortex,* there was no clause discussing the former employee's contact with customers, so the covenant was over broad because it prevented the former employee from competing by doing business with *any* customer, regardless of his former relationship with that customer, and by taking business from a customer he did not solicit. In this case, however, the covenant only limits Scussel's contact with "customer[s] of the Company, or referral sources for customers, including but not limited to physicians, physical therapists, clinics or hospitals, with whom the Employee had any business dealings or contacts on behalf of the Company within two (2) years prior to termination of employment."

The covenant in this case is not identical to the covenant in *Vortex.* The covenant in this case contains a clause which the *Vortex* covenant does not contain. That clause corrects the problem which arose in the *Vortex* covenant. Therefore, Scussel's argument is without merit. The court finds that the covenant in this case does not unreasonably restrict the activities which Scussel may perform. It does not prevent Scussel from doing business with new customers or those customers who initiate contact. The covenant is enforceable as written.

### 3. Unclean Hands

■ Scussel argues that under the Alabama equitable doctrine of "unclean hands," a preliminary injunction should not issue because Hanger broke its Employment Agreement with Scussel and forced Scussel to resign. First, the court reminds Scussel that he agreed that Georgia law controls. Second, the courts finds that, under Georgia law, this argument is without merit.

The Employment Agreement between Scussel and Hanger provides:

> (d) *Independent Obligations.* Employee agrees that his obligations under this section shall survive termination of his employment regardless of the grounds for termination, and that the obligations contained in each of sub-sections (a), (b), and (c) are separate and independent from each other, and from all other obligations in this Agreement. Any failure by the Company to perform its obligations under any other section of this Agreement shall not be a defense to the enforcement by the Company of the obligations contained in each of sub-sections (a), (b), and (c).

Subsections (a), (b), and (c) are the noncompetition and nonsolicitation sections of the agreement. In *Orkin Exterminating Co. v. Gill,* 222 Ga. 760, 152 S.E.2d 411 (Ga.1966), the court found that when a clause like this one is contained within an employment agreement, "whether the employee voluntarily terminated the contract or was involuntarily discharged would be of no consequence, for the covenant restricting the right of the individual to work for a competitor would not be contingent on the manner of termination but 'regardless of who was at fault' would be valid and enforceable." *Id.* at 764, 152 S.E.2d 411. *See also Carroll v. Harris,* 243 Ga. 34, 252 S.E.2d 461 (Ga.1979) (where con-

tract has severability clause and provides "specifically that the employer would not be barred from enforcing the restrictive covenant by reason of the employer's breach of any part of the contract" then employer has not forfeited his right to obtain injunctive relief against former employee). Therefore, even if Hanger wrongfully terminated Scussel—an issue which this court does not address—it is not barred by unclean hands from obtaining an injunction because there is a severability clause within the contract.

In sum, the court finds that the contract is enforceable. Also, the court does not find that Hanger is barred by the doctrine of unclean hands from obtaining an injunction against Scussel. In addition, the evidence clearly proves that Scussel is violating the contract. There is overwhelming evidence that Scussel has violated the Employment Agreement. Most egregiously, he has opened a business which directly competes with Hanger right in the middle of Dothan.[5] For all of these reasons, the court concludes that the plaintiff has met its burden in demonstrating that there is a substantial likelihood that it will prevail on the merits.

## B. Irreparable Injury[6]

"An injury is irreparable only if it cannot be undone through monetary remedies." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir.1983). Scussel claims that monetary remedies are adequate and readily ascertainable in this case; Hanger need only discover who Scussels' referral sources are and how much revenue has been lost since Scussel opened his business. On the other hand, Hanger alleges that it has lost good will with referral sources and customers and has lost income from existing and prospective customers; it also claims that it will possibly have to close its Dothan office since Scussel has much of its Dothan business.

According to the former Fifth Circuit, the loss of customers and good will is an "irreparable" injury. *Spiegel v. City of Houston*, 636 F.2d 997 (5th Cir.1981). *See also Ferrero v. Associated Materials Inc.*, 923 F.2d 1441 (11th Cir.1991) (citing *Spiegel* and finding irreparable harm due to loss of good will and long-time customers).

At the hearing, Hanger established that Scussel's actions have resulted in a loss of good will for the company. Alfred Critter (Critter), Hanger's regional vice president over five states, including Alabama, testified that branch managers like Scussel spend the "majority of their time" calling and writing to customers and referral sources, establishing personal relationships with them, and providing training and demonstrations for them. Scussel would have been in contact with every single referral source. Hanger also encouraged Scussel to take referral sources and customers to lunch or dinner, and provided an entertainment allowance for Scussel. Critter testified that there is a narrow market of referral sources, and it is important to foster and long-term relationship with each source to ensure continued referrals. He also testified that it takes about two years to develop these relationships, so that is why they sought to prohibit Scussel from compet-

---

5. At the hearing Scussel was asked,

Q You admit, don't you Mr. Scussel, that you are currently operating a prosthetics and orthotics business in Dothan, Alabama?
A Yes, ma'am.
Q And that's on Main Street in Dothan?
A 1785 East Main Street.
Q Right across the street from Health South?
A Yes, ma'am.
Q Health South was a major referral source for Hanger while you were branch manager, wasn't it?
A Yeah. It was more than 30 or 40 percent.
Q And right now you're accepting referrals from Health South?
A Yes, ma'am.

Q In fact, you're doing a significant business that has been referred to you by Health South.
A Yes, ma'am.
Q How about Southeast Alabama Medical Center, was that a referral source for Hanger while you were in Hanger's employ?
A Yes, ma'am.
Q And are you presently accepting business from the facility?
A I am.
(p. 169)

6. Since this is an issue only concerning the preliminary injunction and not the substantive contract, federal law applies. *See, e.g., Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982 (11th Cir.1995).

ing with them for two years. According to Critter,

> it's terribly important in the referral source end. When you, ... capture a referral, we're always trying to get a referral source to join the Hanger team to use us as the sole source of providing devices and services to their clientele. One thing we try and do, because the spectrum of services are very large, it's very important to cultivate that relationship so that they have just one place to go.

The evidence at the hearing also established that Hanger lost customers due to Scussel's actions. Indeed, Scussel himself testified that Healthsouth referred customers to Hanger, accounting for 30–40% of its business. Now, Scussel accepts referrals from Healthsouth and Hanger does not receive any. Critter testified that referral sources are Hanger's "bottom line." Critter also testified that the business in the Dothan office "dropped dramatically" when Mr. Scussel left—from $50,000 as a monthly average over a three month period to $15,000.

According to testimony from the hearing held in this case Scussel's competition is causing a loss of good will and a loss of customers for Hanger. Based on Eleventh Circuit case law, this court finds that Scussel's activities caused "irreparable" injury to Hanger in the sense that the harm cannot be undone through monetary remedies.

## C. Balancing of Harm

In order to secure an injunction, Hanger must also prove that the potential harm it faces if relief is not granted outweighs the harm that will occur to Scussel. Scussel argues that he will not be able to earn a livelihood during the course of this litigation while Hanger may "possibly" lose some patients and profits therefrom. Hanger argues that Scussel may compete with Hanger anywhere outside of a 50 mile radius surrounding Hanger's Dothan office. Indeed, according to Scussel's business card, submitted into evidence, he already has two practices established in Columbus and Alba-

ny, Georgia that do not violate the contract. In addition, Hanger points to its loss of good will and customers. In balancing these hardships, the court finds that the harm to Hanger outweighs the harm to Scussel. Scussel is free to compete outside the 50 mile radius to earn a livelihood and has begun to do so in two different locations. Hanger, on the other hand, has already lost 30–40% of its business in the Dothan office—from Healthsouth alone—due to Scussel's actions. Hanger has already lost good will, referral sources, customers, and income. *See Ferrero,* 923 F.2d at 1449.

In addition, the court rejects an issue raised during the hearing that any losses sustained by Hanger are minimal compared to the overall size of Hanger. The Eleventh Circuit "has held 'specious' an argument suggesting that, in deciding [the irreparable injury] element of the preliminary injunction calculus, the court ought to compare the actual losses sustained to the size of the company." *Ferrero,* 923 F.2d at 1449 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham,* 658 F.2d 1098, 1102 n. 8 (5th Cir.1981)).

## D. Public Interest

Finally, in order to obtain an injunction against Scussel, Hanger must prove that the injunction, if issued, will not disserve the public interest. Scussel argues that it is not in the public interest to prevent him from servicing his patients. As support, he cites the affidavit of a referral source in Dothan who wants to refer his patients to Scussel. Hanger, on the other hand, contends that the public interest is served by having persons compete fairly by honoring their contracts. As stated above, Georgia allows covenants against competition to stand if they are reasonable. The court has concluded that this contract is reasonable. Thus, the issuance of an injunction would be within the public interest. *See Ferrero, supra.*

In addition, the parties raise the issue that under Alabama law [7], noncompetition covenants that prevent professionals

---

7. The court recognizes the issue of the public interest under Alabama law since the area in question is in Alabama.

from practicing are void. Therefore, the if orthotists and prosthetists are professionals, it would be against Alabama's public interest to enjoin Scussel from practicing. Under Alabama law, a profession refers to "a group of men pursuing a learned art as a common calling in the spirit of a public service." *Odess v. Taylor,* 282 Ala. 389, 211 So.2d 805 (Ala.1968). The Alabama Supreme Court referenced several relevant factors to be considered in resolving the issue of what constitutes a profession. These factors are: (1) professional training, skill, and experience required to perform certain services; (2) the delicate nature of the services offered; and (3) the ability and need to make instantaneous decisions. *Friddle v. Raymond,* 575 So.2d 1038 (Ala.1991) (citing *Odess,* supra). As Scussel points out, the Alabama courts have found physicians, veterinarians, and accountants to be professionals. They have never decided this issue with respect to orthotists or prosthetists.

In examining the three factors listed above, this court finds that orthotists and prosthetists are not professionals as that term is defined under Alabama law. First, they do not require professional training, skill, or experience. Indeed, the practice of orthotics and prosthetics is not subject to licensure requirements or government regulations by the state of Alabama or the Federal Government. In addition, "fewer than 30 individuals are certified in orthotics by the [American Board for Certification in Orthotics & Prosthetics, Inc. (ABC) ]," while there are in excess of 500 providers. Further, over half of the prosthetists and orthotists in Alabama do not have a college degree. *See McNeill affidavit.* Second, this is not a trade which requires the ability and need to make quick decisions. From the testimony elicited at the hearing, it appears as though a 24 hour turn around time is considered quick for the servicing of a device. Third, the court is not convinced that this service is delicate in nature, especially as compared to the nature of the law or medicine. In those professions, life and liberty are at stake. In the trade at hand, however, nothing as crucial is at stake. There is a delicacy in dealing with customers—but that is true for any trade. For these reasons, the court finds

that prosthetists and orthotists are not professionals. Therefore, an injunction will not offend the public interest in Alabama.

## TRADE SECRETS

### A. Substantial Likelihood of Success on the Merits

 Hanger claims that Scussel "used, modified or adapted" trade secrets and confidential information in violation of his employment contract. The specific provisions which Hanger alleges have been violated are:

a) *Trade Secrets.* During the period of his employment with the Company, and for so long afterwards as the pertinent ideas and information remain trade secrets, the Employee will not disclose to anyone, and will not use, modify, or adapt (except as required in the course of performing his duties for the Company) any trade secrets of the Company or its affiliates without first obtaining the Company's written consent.

and

b) *Confidential Information.* During the period of his employment with the Company, and for two (2) years thereafter, the Employee will not disclose to anyone, and will not use, modify, or adapt (except as required in the course of performing his duties for the Company) any confidential information of the Company or its affiliates without first obtaining the Company's written consent.

According to the Georgia Supreme Court,

The Georgia Trade Secrets Act of 1990 provides that actual or threatened misappropriation of trade secrets may be enjoined. OCGA § 10–1–762(a). To be classified as a trade secret, the information in question (1) must not be readily ascertainable by proper means by persons who can benefit from its use and (2) must be the subject of reasonable efforts to maintain its secrecy. OCGA § 10–1–761(4).

*Leo Publications, Inc. v. Reid,* 265 Ga. 561, 458 S.E.2d 651 (Ga.1995). Thus, this court must determine whether the information at issue is readily ascertainable by proper means by persons who can benefit from its

use and whether Hanger made reasonable efforts to maintain its secrecy.

At the hearing, Critter identified the items which he believed to be confidential information or trade secrets of Hanger: "pricing strategies, marketing plans, marketing alternatives, business plans, contracts. You know, with managed care coming, we write a lot of contracts; knowing what those negotiation levels are, what different things are required within that. There is a variety of things in the way we navigate the marketplace." Critter also identified customer lists.

On cross examination, Critter discussed these areas in more detail. When asked about pricing strategies he stated,

> for instance, we have internal programs, or internal directions as to how to negotiate with a pricing supervisor at a hospital. We have contracts that have certain negotiated fees which we would prefer competitors not to learn because then they can undercut the fee, and we have made that contract to our advantage.

He also stated that he told Scussel how to "skirt a dollar figure by saying that your services are of greater value because you can provide this, this and this. Many times when giving a price with individuals you're dealing with somebody who just looks at costs; this costs a dollar, and this one costs ninety-five cents." At this point in the testimony, the court interjected, "In all candor, though, that's hardly a unique approach with J.E. Hanger. I mean, isn't that a fairly common thing, that if you're priced higher than your competitor and you sell a service as opposed to price?" Critter responded, "Yes, sir. But the point would be that Rick wouldn't know this until we brought him in and trained him as a branch manager." The court finds this reasoning without merit in the context of trade secrets. Hanger has made no showing that it attempts to conceal this information or it is not otherwise readily ascertainable.

Critter also complained that Scussel had Hanger's Manage Contract Book which contains the pricing strategy used for approximately 100 third party payers, like insurance companies. Later in his testimony, however, he admitted that he did not know if Scussel took that book from Hanger. He stated that

he had no evidence and nothing was brought to his attention indicating that Scussel took the book. In addition, without evidence that this book is not readily ascertainable by proper means and that Hanger attempted to keep it a secret from its competitors, this claim is without merit.

Critter also claimed that the manner in which Hanger sets its usual customary fees is confidential. However, as above, Critter admitted that, to his knowledge, information concerning Hanger's usual and customary fees or fee schedules were not removed from Hanger's office. For the reasons stated above, this claim is also without merit.

Critter also stated that Scussel learned how to properly code different fabrication techniques, which gave him a competitive edge. Later, however, he agreed that coding and how to use coding is common in the industry. Thus, it is readily ascertainable by proper means.

Veronica Mason (Mason), a Hanger employee, also testified. She stated that Scussel took vendor materials and information from Hanger. Later she testified that any prosthetist can call the manufacturer and ask for this information, and it will be sent immediately. Vendor materials and information are therefore readily ascertainable and do not qualify as trade secrets. In addition, she testified that Scussel took demos from Hanger. There is no evidence, however, that these demos are trade secrets—at the very least, there is no evidence that Hanger has tried to keep these demos a secret. Indeed, they are not even mentioned in Scussel's employment contract.

Critter also testified that Hanger taught Scussel "a fabrication technique that would reduce for the practitioner the time taken to complete the procedure, which is increase for reimbursement and increase in profit." Critter said that this was a technique not done by other orthotists or prosthetists. He said that it was unique to different practitioners, and not to all Hanger offices. First, Hanger has provided no testimony or other evidence concerning whether this information is readily ascertainable by proper means by persons who can benefit from its use. In addition,

Scussel testified that he does not intend to use this technique in his practice.[8] For these reasons, the court finds that Hanger has not met its burden of proof on this issue.

Critter also talked about formulas that Hanger taught Scussel, such as "how to make the recipes, the plastics, the gel, things like that." When asked whether that is a trade secret and generally not known by other orthotists and prosthetists across the country Critter responded, "I'm sure they know many things I don't know, or that J.E. Hanger doesn't know, but those things, the many things that are unique to what J.E. Hanger teaches its practitioners, there are the ways of making things and doing things." Even if it can be said that these formulas are unique to J.E. Hanger, Hanger has offered no evidence that this information is not readily ascertainable by proper means by persons who can benefit from its use. Without such evidence, the court cannot deem these formulas "trade secrets."

■ The only other item which Hanger alleges to be in issue is its list of customers or referrals. Mason testified that Scussel asked her to provide him with a printout from the computer of the names, addresses, and phone numbers of existing Hanger patients so that he could contact them when he left. Scussel testified that he never took patient lists from Hanger. In addition, he did not take a referral list because he "knew [his] referrals." He admitted, however, that he took a Rolodex containing the names of customers and referral sources, and their phone numbers because "that was my Rolodex."

The court finds that Hanger's customer lists meet the trade secret criteria. First, the list is not readily ascertainable except by

obtaining the information through Hanger. Hanger is the only organization which knows which customers come from which referrals. It is conceivable that a person could go to every referral source in Dothan and ask if he or she has patients who are also patients of Hanger. The absurdity of this task, however, demonstrates that Hanger's list is not "readily ascertainable." In addition, Hanger required Scussel to sign a covenant which specifically prevents him from disclosing, using, modifying, or adapting this information. This is a step that Hanger took to ensure the secrecy of its list.

**B. Irreparable Injury**

■ Hanger must next prove that irreparable injury will occur unless an injunction is issued with regard to the customer lists.[9] As stated above, the loss of customers and good will is an "irreparable" injury. *Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir.1981). *See also Ferrero v. Associated Materials Incorporated,* 923 F.2d 1441 (11th Cir.1991) (citing *Spiegel* and finding irreparable harm due to loss of good will and long-time customers). It is clear to the court that Scussel's use of Hanger's customer lists will cause a loss of customers and good will. Therefore, the irreparable injury prong of the injunction has been met.

**C. Balancing of Harm**

■ The court finds that the potential harm Hanger faces if relief is not granted outweighs the harm that will occur to Scussel. Customer lists are the backbone of any company. By placing this information in the hands of a competitor, Hanger faces serious harm—the loss of customers in the future. For example, even if Scussel cannot compete

---

**8.** When Critter testified about this technique, he said that Scussel learned it at a manager's meeting in New Orleans. When Scussel was asked about the information he learned at the managers meeting in New Orleans, he stated that he tried some techniques that did not work. He also stated that there was no other information from the meeting that he intended to use in his new practice. Later in his testimony, Scussel referred to a 24 hour turn around time strategy that he used with his referral sources, and stated that this was his idea, not Hanger's. It is not clear to the court whether the technique to which

Critter referred is information that Scussel never intends to use or information that Scussel contends was his own idea. Either scenario helps Scussel. In any event, the court primarily rests its ruling on the fact that Hanger has made no attempt to properly classify this information as not readily ascertainable.

**9.** In using the term customer list, the court refers to any customer or referral lists printed out by Hanger computer or any such information contained on the Rolodex in question.

with Hanger today, the customer lists allows him to foster relationships with Hanger's customers for the future. On the other hand, since Scussel cannot compete with Hanger now, he is not losing current customers by not having the list readily accessible. The court finds that the balance of harms weighs more heavily in Hanger's favor.

### D. Public Interest

 Finally, Hanger must prove that the injunction, if issued, will not disserve the public interest. The public has an interest in being serviced by an orthotist and/or prosthetist. Since Hanger will maintain its customer lists, this need will be met. In addition, all customers are free to contact Scussel if they wish to have their needs met by him. The injunction will not prevent this, and is therefore will not disserve the public interest.

### CONCLUSION

For the foregoing reasons, the court concludes that a Preliminary Injunction should issue. A separate Order will be entered.

### *ORDER AND PRELIMINARY INJUNCTION*

In accordance with the memorandum opinion entered on this date, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) The Application for Preliminary Injunctive Relief, filed by the plaintiff, J.E. Hanger, Inc., on May 30, 1996, is GRANTED.

(2) The Partial Motion to Dismiss the plaintiff's Complaint for Injunction Relief, filed by the defendant, Richard C. Scussel, on June 14, 1996, is DENIED.

(3) The defendant, Richard C. Scussel, is PRELIMINARILY ENJOINED and RESTRAINED from taking any actions which violate the provisions of Section VI and VII of the Employment Agreement entered into on June 29, 1993 by Richard C. Scussel and J.E. Hanger, Inc. The actions which are preliminarily enjoined include but are not limited to engaging in competitive activity in violation of the noncompetition covenants contained in the Employment Agreement, soliciting J.E. Hanger Inc.'s customers and referral sources of customers in violation of the nonsolicitation covenants contained in the Employment Agreement, and utilizing J.E. Hanger Inc.'s customer and referral lists in violation of the confidentiality covenants contained in the Employment Agreement.

(4) The defendant, Richard C. Scussel, is also hereby ORDERED to return any and all customer and referral lists including the Rolodex to J.E. Hanger Inc. on or before August 8, 1996.

The clerk of the court is DIRECTED to issue a writ of injunction.