The defendant, Anniston Urologic Associates, P.C. ("Anniston Urologic"), appeals from a partial summary judgment for the plaintiff, Dr. Michael B. Kline. Dr. Kline had sought a judgment declaring that parts of an employment contract and a stock redemption agreement were unenforceable as covenants not to compete, relying on Ala. Code 1975, § 8-1-1(a),[1] and Anniston Urologic had sought by way of a counterclaim to require specific performance of the stock redemption agreement and to recover damages for an alleged breach of that agreement and, in addition, to recover damages for the alleged breach of the employment contract. We affirm in part, reverse in part, and remand.
Anniston Urologic, a professional corporation organized under the Revised Alabama Professional Corporation Act, Ala. Code 1975, § 10-4-380 et seq., hired Dr. Kline in 1985. Dr. Kline became a stockholder in Anniston Urologic in 1988 and entered into separate employment and stock redemption agreements. Both agreements provided that upon the termination of his employment Dr. Kline was to sell his stock in Anniston Urologic back to the corporation. The employment agreement also provided:
 "(d) It is expressly acknowledged that in the event of the voluntary termination of this EMPLOYMENT AGREEMENT by the Employee so that the terms of Paragraph 2 of the said STOCK REDEMPTION AGREEMENT become applicable, the 'total purchase price' properly payable to a 'departing shareholder' under the terms of the STOCK REDEMPTION AGREEMENT under the provisions thereof shall be reduced as follows in the event of the occurrence of either of the below described contingencies:
 "(i) if a Shareholder/Employee of the Corporation voluntarily terminates his employment relationship with the Corporation at a time when said Shareholder/Employee is not 'disabled' as that term is therein described, without giving the Corporation nine (9) calendar months advance written notice of his intention to so voluntarily terminate, then in such event the 'total purchase price' otherwise payable thereunder by the Corporation to said departing shareholder shall be reduced by the sum of Twenty thousand and No/100 ($20,000.00) Dollars; or
 "(ii) if a Shareholder/Employee of the Corporation voluntarily terminates his employment relationship with the Corporation and during the one (1) year period commencing on the date of said termination, engages in the practice of medicine at a location within a twenty-five (25) mile radius of the Corporation's offices at 411 East 9th Avenue, Anniston, Alabama, then in such event the 'total purchase price' otherwise payable thereunder by the Corporation to said departing Shareholder shall be reduced by the sum of Seventy-Five thousand and No/100 ($75,000.00) Dollars." *Page 56 
The stock redemption agreement contained similar language. On its face, each agreement contained a covenant purporting to impose a $20,000 penalty on Dr. Kline (by devaluing his stock) if he terminated his employment without giving nine months' advance written notice of his intention to terminate. (For the sake of clarity, this covenant will at times be referred to in this opinion as the "first covenant.") In addition, both agreements contained a covenant purporting to impose an additional $75,000 penalty on Dr. Kline (again, by devaluing his stock) if he practiced medicine in competition with Anniston Urologic within one year after the termination of his employment and within 25 miles of his former office. (This covenant will at times be referred to in this opinion as the "second covenant.") Dr. Kline terminated his employment without giving nine months' written notice, and he began within a year to practice medicine within 25 miles of Anniston Urologic. This litigation ensued. The trial court entered a partial summary judgment for Dr. Kline, declaring that both of the covenants illegally restricted or interfered with his ability to practice medicine.[2] The trial court also ruled in Dr. Kline's favor on Anniston Urologic's counterclaim.
Because each of the covenants at issue has its own particular field of operation, we will discuss each covenant separately, beginning with the second covenant, as quoted above from paragraph (d)(ii) of the employment contract. As previously noted, the second covenant provided:
 "[I]f a Shareholder/Employee of the Corporation voluntarily terminates his employment relationship with the Corporation and during the one (1) year period commencing on the date of said termination, engages in the practice of medicine at a location within a twenty-five (25) mile radius of the Corporation's offices at 411 East 9th Avenue, Anniston, Alabama, then in such event the 'total purchase price' otherwise payable thereunder by the Corporation to said departing Shareholder shall be reduced by the sum of Seventy-Five thousand and No/100 ($75,000.00) Dollars."
It is well settled in Alabama that to the extent a contract restrains the practice of a lawful profession, it is void, under § 8-1-1(a), as against public policy. See Pierce v. Hand,Arendall, Bedsole, Greaves Johnston, 678 So.2d 765
(Ala. 1996); Friddle v. Raymond, 575 So.2d 1038 (Ala. 1991);Cherry, Bekaert Holland v. Brown, 582 So.2d 502 (Ala. 1991);Salisbury v. Semple, 565 So.2d 234 (Ala. 1990). In AssociatedSurgeons, P.A. v. Watwood, 295 Ala. 229, 231-32, 326 So.2d 721,722-23 (1976), this Court held unenforceable a contractual provision that imposed a financial penalty on a physician if he terminated his employment and engaged in the practice of medicine within a year in Tallapoosa County. This Court, in pertinent part, stated:
"The contract provides:
" '7. TERMINATION
" '. . . .
 " 'C. Watwood may terminate this Agreement at any time upon (30) days written notice to the Association and the Association shall be obligated in that event to pay to Watwood his compensation up to the date of termination only. In the event Watwood shall terminate this Agreement and enter into the practice of medicine and surgery within Tallapoosa County within twelve (12) months following such termination of employment with the Association, he shall pay to the Association, as liquidated damages, Twenty Thousand and No/100 ($20,000) Dollars. It is agreed by the parties that Watwood is receiving direct benefit and goodwill from the reputation and goodwill previously developed by the Association and its other physicians and surgeon and that such termination and entry into practice in Tallapoosa County subsequent to the practice of medicine with the Association would cause irreparable damage to the Association.'
 "The plaintiff concedes that contracts restraining the practice of a profession are *Page 57 
void under Title 9, § 22, [Ala. Code of 1940,] supra. However, it argues that cases so holding, Gant v. Warr, 286 Ala. 387, 240 So.2d 353 (1970), and Odess v. Taylor, 282 Ala. 389, 211 So.2d 805
(1968), are distinguishable from this case. It says, in brief:
 " '. . . this contract provision is not a restraint of the exercise of the medical profession but it is simply a means of compensation for the benefit received by the Defendant by his having been associated with the Plaintiff in the practice of medicine. . . .'
 "There is universal agreement that the law looks with disfavor upon contracts which restrain employment. Hill v. Rice, 259 Ala. 587, 593, 67 So.2d 789 (1953).
 "We are convinced that a contract which requires the payment of damages in the event one of the contracting parties competes with the other is a contract 'by which . . . one is restrained from exercising a lawful profession . . .' within the meaning of § 22, supra. Professor Williston finds that '. . . Any bargain or contract which purports to limit in any way the right of either party to work or to do business . . . may be called a bargain or contract in restraint of trade.' 14 Williston on Contracts, § 1633 (3d ed. 1972).
 "The fact that the contract provision is couched in terms of liquidated damages rather than in negative form is not significant. '. . . This is clearly a restraint of a substantial character and the form in which it is cast does not make it less a restraint. . . .' Chamberlain v. Augustine, 172 Cal. 285, 288, 156 P. 479, 480 (1916).
 "In Chamberlain v. Augustine, supra, the contract provided for the payment of $5,000 as liquidated damages in the event the contracting party went into the same business as the other party to the agreement. In construing its statute on restraint of a trade or profession, which incidentally is identical to our own, the California Court said:
 " 'It will be observed that defendant Augustine's covenant with respect to liquidated damages is not expressly cast in negative form, and because of this it is insisted by appellant that it is not a contract restraining Augustine from exercising a lawful business, but is merely an agreement that if he did engage in such business he would pay the sum of $5,000 [five thousand dollars] as liquidated damages, and that the contract does not, therefore, violate the Code provision. In form, the agreement is as appellant claims. But none the less it is a contract which operates to restrain Augustine from carrying on the business mentioned. It imposes upon him a liability in the sum of $5,000 [five thousand dollars] if he does engage in such business. If the contract is valid, he is not as free to do so as he would have been if he were not bound by it. To the extent that the necessity of paying $5,000 [five thousand dollars] deters him from engaging therein, he would be restrained. This is clearly a restraint of a substantial character and the form in which it is cast does not make it less a restraint. . . . The covenant in question clearly operates to restrain the defendant from "exercising a lawful profession, trade, or business" [the language of the California and Alabama statutes] and as it does not fall within the exceptions given in section 1673, it is, therefore, void.' (172 Cal. at 288, 156 P. at 480)
 "We find the reasoning of the California Court compelling. In the instant case, too, the language of the contract has been framed in positive rather than negative terms. However this appears to us to be a matter of form rather than substance; the purpose of the provision is to penalize the defendant if he terminates his employment with the plaintiff and engages in the practice of medicine in Tallapoosa County within twelve months thereafter. In effect, it requires him to forfeit $20,000 in order to pursue the practice of medicine in that county within that period of time. It is a restraint on the exercise of a lawful profession in violation of Title 9, § 22, supra, and is therefore void."
Based on the cases cited above, we conclude that the second covenant, purporting *Page 58 
to restrain Dr. Kline from practicing medicine within one year of the termination of his employment with Anniston Urologic and within 25 miles of his former office, was made unenforceable by § 8-1-1(a). We hold, therefore, that the partial summary judgment for Dr. Kline declaring the second covenant void as to both agreements was proper.
In so holding, we note that Anniston Urologic's reliance onMann v. Cherry, Bekaert Holland, 414 So.2d 921 (Ala. 1982), and Pierce v. Hand, Arendall, Bedsole, Greaves Johnston, supra, in support of its argument that the noncompetition covenants are enforceable is misplaced. In Mann, this Court considered a contract for the sale of an accounting practice; the contract contained mutual noncompetition covenants. The buyer stopped making payments to the seller after concluding that the covenants not to compete rendered the entire contract void. This Court held that the noncompetition covenants were void; however, because the evidence did not indicate that the seller had attempted to compete with the buyer (and, thus, did not indicate a failure of consideration and lack of mutuality between the parties), this Court went on to hold that the buyer had in fact received all that he had bargained for and, under general equitable principles, that he should not be allowed to use the unenforceability of the noncompetition covenants to otherwise avoid his contractual obligation to pay for the accounting practice. Mann is factually dissimilar to the present case. Here, the issue presented does not concern whether any of the other provisions in the employment contract or in the stock redemption agreement are enforceable. In other words, Anniston Urologic does not contend that Dr. Kline, notwithstanding the unenforceability of the second covenant, should be estopped from not performing under other provisions in the two agreements. Instead, Anniston Urologic argues only that the second covenant does not restrain Dr. Kline from practicing medicine and that it will not get the full benefit of its bargain if the value of Dr. Kline's stock is not reduced to compensate it for his failure to comply with the covenant. The rationale underlying this argument was specifically rejected in Associated Surgeons, P.A. v. Watwood, supra.
In Pierce, supra, this Court considered whether the trial court had erred in holding that an attorney was equitably estopped from asserting his claim to deferred compensation under his former firm's partnership agreement, which conditioned the payment of the deferred compensation on the attorney's not practicing in competition with his former firm. The attorney had left his former firm and was practicing in competition with it. We stated that "[t]he party asserting the doctrine of equitable estoppel may not predicate his claims on his own dereliction of duty or wrongful conduct." 678 So.2d at 768. After concluding that senior attorneys in the firm had drafted the noncompetition covenant into the partnership agreement, we held that the firm's participation in the drafting of that covenant precluded its assertion of the doctrine of equitable estoppel. The record in the present case indicates that the other stockholder/physicians in Anniston Urologic directly participated in the drafting of the second covenant; therefore, under the holding in Pierce, Anniston Urologic cannot rely on the doctrine of equitable estoppel to defeat Dr. Kline's claim to the full value of his stock. Although the evidence, viewed in the light most favorable to Anniston Urologic, indicates that Dr. Kline also directly participated in the negotiation of the second covenant and that he understood it and wanted it, Anniston Urologic did not raise the doctrine of in pari delicto as an affirmative defense before the entry of the judgment. See Pierce, supra, at 769.
We also note, but are not persuaded by, Anniston Urologic's contention that Ala. Code 1975, § 10-4-389(j), part of the Revised Alabama Professional Corporation Act ("the Act"), repealed § 8-1-1(a) by implication insofar as agreements governing the purchase, redemption, or transfer of shares of a domestic professional corporation organized under the Act are concerned. Section 10-4-389(j) provides:
 "Any provision regarding purchase, redemption or transfer of shares of a domestic professional corporation contained in the articles of incorporation, bylaws or any *Page 59 
private agreement shall be specifically enforceable in the courts of Alabama."
There is nothing in the Act, or in the comments to the Professional Corporation Supplement to the Model Business Corporation Act (drafted by the Committee on Corporate Law of the American Bar Association), which served as a guide for the drafting of the Act, that would suggest a specific intent on the Legislature's part to repeal § 8-1-1(a), which reflects the established public policy of this state. The Act provides for domestic professional corporations to be organized for the purpose of rendering professional services and services ancillary thereto, see § 10-4-383, and it creates a framework for the practice of a profession within the corporate context. However, the general recognition in § 10-4-389(j) that unspecified agreements regarding the purchase, redemption, or transfer of shares of stock in a professional corporation are judicially enforceable does not, standing alone, signify a movement by the Legislature away from the established general rule that contracts dealing with an illegal subject matter or contracts otherwise in violation of public policy are not enforceable, and it is an insufficient basis for this Court to hold that the Legislature intended to partially repeal §8-1-1(a). The implied repeal of a statute by another statute is not favored by the courts and will be found only when the two statutes are so repugnant to, or in such conflict with, one another that it is obvious that the Legislature intended to repeal the first statute. Benson v. City of Birmingham,659 So.2d 82 (Ala. 1995). It is certainly not obvious from an examination of §§ 8-1-1(a) and 10-4-389(j) that the Legislature, by enacting § 10-4-389(j), intended to carve an exception out of § 8-1-1(a), so as to allow professionals practicing in a corporation organized under the Act to enter into enforceable agreements restraining the exercise of a lawful profession. If that had been the intent of the Legislature, it could have made, and now should make, its wishes clearly known.[3] We do not agree, however, that the first covenant, as quoted above from paragraph (d)(i) of the employment contract, was, under § 8-1-1(a), unenforceable as a restraint on a lawful profession. The first covenant, as previously noted, provided:
 "[I]f a Shareholder/Employee of the Corporation voluntarily terminates his employment relationship with the Corporation at a time when said Shareholder/Employee is not 'disabled' as that term is therein described, without giving the Corporation nine (9) calendar months advance written notice of his intention to so voluntarily terminate, then in such event the 'total purchase price' otherwise payable thereunder by the Corporation to said departing shareholder shall be reduced by the sum of Twenty thousand and No/100 ($20,000.00) Dollars."
On its face, this covenant merely required Dr. Kline to give Anniston Urologic nine *Page 60 
months' written notice of his intention to terminate his employment. The record reflects that this requirement was intended by the contracting parties to afford Anniston Urologic sufficient time in which to hire another physician and to otherwise provide for a smooth transition from one physician to another or, in the event nine months' notice was not given, to compensate the corporation for any economic hardship caused by the failure to give such notice. This covenant did not restrain Dr. Kline from practicing medicine for any period of time or restrain him from practicing medicine within a specified geographical area. Restrictions such as those contained in the second covenant tend to deny the public in the affected area access to a trained professional, see Odess v. Taylor, 282 Ala. 389, 211 So.2d 805 (1968), and, therefore, have repeatedly been struck down by the courts as unenforceable on public policy grounds. However, this Court has not held that a notice provision, under facts similar to those presented here, constitutes a restraint on the practice of a lawful profession and is therefore voided by § 8-1-1(a). The record indicates that Dr. Kline left his employment at Anniston Urologic and thereafter opened his own office, which presently is in the same building as Anniston Urologic. We fail to see how enforcement of the first covenant — by requiring Dr. Kline to continue to practice medicine as an employee of Anniston Urologic for nine months, so as to enable the corporation to retain another physician, or by requiring Dr. Kline to, in essence, pay compensation to the corporation for failing to give the required notice — violates the public policy underlying § 8-1-1(a). At no time would the enforcement of the first covenant have adversely affected the public by preventing Dr. Kline from treating patients in the geographical area in which he practices. Section 8-1-1(a) was a departure from the general right of professionals to freely contract with respect to matters governing their professional and business relationships. In the absence of any clear public policy considerations to the contrary, we decline to construe §8-1-1(a) as voiding a duly bargained-for notice provision, such as the one at issue in this case. See Tomlinson v. Humana,Inc., 495 So.2d 630 (Ala. 1986).
For the foregoing reasons, the judgment is affirmed, insofar as the second covenant is concerned; however, insofar as the first covenant is concerned, the judgment is reversed. The case is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOOPER, C.J., and MADDOX, KENNEDY, COOK, and SEE, JJ., concur.
[1] Dr. Kline also sought a declaration as to the value of his stock in Anniston Urologic.
[2] Other issues surrounding Dr. Kline's request for a declaration as to the value of his stock remained pending. See Rule 54(b), Ala.R.Civ.P.
[3] Anniston Urologic also argues that §§ 10-2B-6.27 and10-2B-7.32, both part of the Alabama Business Corporation Act, Ala. Code 1975, § 10-2B-1.01 et seq., which apply to professional corporations organized under the Act to the extent that they are not inconsistent with it, see § 10-4-381, are authority for the proposition that professionals practicing in a corporation organized under the Act may lawfully enter into agreements restraining the exercise of a lawful profession. In further support of this argument, Anniston Urologic cites FirstAlabama Bancshares, Inc. v. McGahey, 355 So.2d 681 (Ala. 1977). Neither § 10-2B-6.27 (which provides for certain restrictions on the transfer or registration of transfer of shares of stock in a business corporation) nor § 10-2B-7.32 (which provides for certain shareholder agreements), assuming their applicability to professional corporations, suggests that the Legislature ever had in mind the repeal of § 8-1-1(a). To the contrary, §10-2B-7.32(a)(8) specifically provides for a shareholder agreement "inconsistent with one or more provisions of this chapter in that it . . . [o]therwise governs the exercise of the corporate powers or the management of the business and affairs of the corporation or the relationship among the shareholders, the directors and the corporation, or among any of them, and is not contrary to public policy." (Emphasis added.) Curiously, Anniston Urologic quoted all but the emphasized part of this provision on page 28 of its initial brief to this Court in support of its contention that the Legislature has signaled a retreat from the heretofore established rule that contractual provisions in violation of this state's public policy are unenforceable. Likewise, FirstAlabama Bancshares, Inc. v. McGahey presented the basic question whether the exchange of stock involved in a merger constituted a "sale" of goodwill within the meaning of Title 9, § 23, Code 1940 (Ala. Code 1975, § 8-1-1(b)). That case did not address whether a noncompetition covenant restraining the exercise of a lawful profession was enforceable.