**BENCHMARK MEDICAL HOLDINGS, INC., et al., Plaintiffs,**

v.

**REHAB SOLUTIONS, LLC, et al., Defendants.**

No. CIV.A.03–A–993–N.

United States District Court, M.D. Alabama, Northern Division.

March 5, 2004.

David J. Middlebrooks, Albert Loring Vreeland, II, R. Brett Adair, Lehr Middlebrooks Price & Vreeland, PC, Birmingham, AL, for Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, Benchmark Acquisition Corp., plaintiffs.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, for Rehab Solutions, Inc.

Robert A. Huffaker, Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, AL, Richard A. Ball, Jr., B. Saxon Main, Ball, Ball, Matthews & Novak, P.A., Montgomery, for Glen "Rocky" Barnes, Quinn S. Millington, Dale M. Yake, defendants.

## MEMORANDUM OPINION AND ORDER

ALBRITTON, Chief Judge.

### I. INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Glen "Rocky" Barnes ("Defendant" or "Barnes") on January 30, 2004 (Doc. # 80). Barnes seeks summary judgment on the claims brought against him, and he also seeks partial summary judgment on his counter-claims.

Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, and Benchmark Acquisition Corporation ("Plaintiffs" or "Benchmark") filed their Complaint on October 2, 2003 bringing claims for violation of the Lanham Act (Count I), violation of the Alabama Trade Secrets Act (Count II), breach of the asset purchase agreement against Barnes (Count III), breach of employment agreements against Barnes, Quinn S. Millington ("Millington"), and Dale M. Yake ("Yake") (Count IV), breach of non-competition agreements against Millington and Yake (Count V), breach of fiduciary duty against

Barnes, Millington, and Yake (Count VI), and tortious interference with contract (Count VII).[1] The Plaintiffs reached a settlement with Millington, Yake, and Rehab Solutions, LLC which resulted in a joint stipulation of dismissal; thus, Count V is due to be dismissed. As a result of this settlement, the issues raised in Count I (Lanham Act) and Count II (the Alabama Trade Secrets Act) have been resolved; accordingly, the Plaintiffs agree that Count I and Count II are due to be dismissed. Plaintiffs' Opposition to Barnes's Motion for Summary Judgment at 2 n. 1. Barnes is the only remaining Defendant. Subsequent to the filling of Barnes's motion for summary judgment, this court dismissed without prejudice Barnes's counter-claims. Therefore, Barnes's Motion, insofar as he seeks partial summary judgment on his counter-claims, is rendered moot. The remaining claims against Barnes before this court include Count III (breach of the asset purchase agreement), Count IV (breach of the employment agreement), Count VI (breach of fiduciary duty), and Count VII (tortious interference with contract).

For the reasons to be discussed, Barnes's Motion for Summary Judgment is due to be DENIED.

## II. *SUMMARY JUDGMENT STANDARD*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing, or pointing out to, the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–324, 106 S.Ct. 2548.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548. To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After the nonmoving party has responded to the motion for summary judgment, the

---

**1.** The Plaintiffs' claims for violation of the Lanham Act and the Alabama Trade Secrets Act and for tortious interference with contract were brought against all of the Defendants: Barnes, Millington, Yake, and Rehab Solutions, LLC.

court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## III. *FACTS*[2]

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

On September 28, 2001, Benchmark purchased Rehab Associates for thirty million dollars. Benchmark owns, through its subsidiaries, a network of physical and occupational rehabilitation facilities in various locations in the United States. Rehab Associates is a physical therapy business, which when it was purchased was operating approximately thirty-seven physical and occupational health facilities located in Alabama, Colorado, Georgia, Illinois, and Missouri. To Benchmark, however, the acquisition of Rehab Associates went beyond the facilities. The "purchase of Rehab Associates was largely a purchase of Rocky [Barnes] and his team, and their relationships that they had in the entire Southeast." Binstein Deposition at p. 91, lines 2–6. Benchmark believed that it was buying "the goodwill and the relationships and the good reputation of the local team. Primarily, Rocky Barnes who grew this business into what it [was] on the day they sold to us." *Id.* at 93, lines 20–23; at p. 94, line 1. For the Plaintiffs, "a huge part of … getting the benefit of [their] bargain and [the] deal working, was [Barnes] and the team cultivating all those relationships, and developing all those opportunities to grow Rehab Associates into something

much bigger than it was on the day of acquisition." *Id.* at p. 91, lines 7–13.

As part of the Purchase Agreement, Barnes agreed to a non-compete provision that provides as follows:

**Prohibited Activities.** Barnes agrees that for a period of five (5) years from the Closing Date, he will not, anywhere within seventy-five (75) miles of any of the facilities operated or managed by a Company as of the date hereof (the "Territory"):

(a) (directly or indirectly) own, manage, operate, join, control, finance or participate in the ownership, management, operation, control or financing of, or be connected as an officer, director, employee, principal, agent, representative, consultant, investor, owner, partner, manager, joint venturer or otherwise with, or permit his or its name to be used by or in connection with, any business or enterprise engaged anywhere in the Territory in the businesses conducted by Buyers or a Company or any businesses engaged in by Buyers or a Company or their affiliates on the Closing Date, during the two year period prior to the Closing Date, or at the time of their termination.

(b) call on or solicit any person who or which is, at that time, or has been within two years prior thereto, a customer of a Company or its affiliates with respect to any business of Buyers or a Company or its affiliates covered by clause (a) above;

(c) solicit the employment of or hire any person who at the time of such

---

**2.** Several of the Plaintiffs' Exhibits amount to little more than a header with an exhibit number or an electronic mail ("e-mail") communication with the sender's name, the recipient's name, and title, but no message. Some examples include Plaintiffs' Exhibits 8 and 9 attached to Millington's deposition. The Plaintiffs have included an Exhibit 8 and 9,

but the substance of those exhibits is missing. For example, the alleged "action plan" of Exhibit 9 is not contained on the exhibit that was submitted to this court. Accordingly, the court in reaching its determination on the Defendant's Motion for Summary Judgment has ignored the unsupported portions of the Plaintiffs' briefs.

solicitation or hiring or who within one year prior thereto, is or was employed by a Company or its affiliates on a full or part-time basis; or

(d) call upon any person as a prospective acquisition candidate who was, either called upon by a Company as a prospective acquisition candidate or was the subject of an acquisition analysis by a Company.

Notwithstanding the above the foregoing covenant shall not be deemed to prohibit Barnes from acquiring as a passive investment not more than five (5) percent of the outstanding voting capital stock of a competing business, whose stock is traded on a national securities exchange or through the automated quotation system of a registered securities association. Plaintiffs' Exhibit A at § 6.2.

Viewed as a particularly valuable asset, Barnes's employment with Benchmark as Regional Vice President was a condition of the sale of Rehab Associates. His job responsibilities "were exclusively managerial and executive in nature; he was not responsible for providing patient care." Complaint at ¶ 18; Barnes's Answer at ¶ 9. Pursuant to the employment agreement, Barnes was required to perform the duties of his position faithfully and diligently. He agreed to devote his "full business time and attention to the performance of his duties and responsibilities . . . ." Plaintiffs' Exhibit B. at § 2.

His employment agreement includes a non-compete agreement that provides as follows:

In consideration of his employment with the Company, the Employee agrees that, during his employment with the Company and for twenty-four (24) months following the date of the Employee's termination from the Company, he will not directly or indirectly: (a) engage, whether as a principle, agent, investor, representative, stockholder (other than as the holder of not more than five percent (5%) of the stock or equity of any corporation, the capital stock of which is publicly traded), employee, consultant, volunteer or otherwise, with or without pay, in any activity or business venture, anywhere within the continental United States, which is competitive with the business of the Company or any of its subsidiaries on the date of his termination; (b) solicit or entice or endeavor to solicit or entice away from the Company or any of its subsidiaries any director, officer, employee, agent or consultant of the Company or any of its subsidiaries, either on his own account or for any person, firm, corporation or other organization, whether or not the person solicited would commit any breach of such person's contract of employment by reason of leaving the Company's service; (c) solicit or entice or endeavor to solicit or entice away any of the clients or customers of the Company or any of its subsidiaries, either on his own account or for any other person, firm, corporation or organization; or (d) employ any person who was a director, officer or employee of the Company or any of its subsidiaries on the date of the Employee's termination, unless such person's employment was terminated by the Company or any of its subsidiaries, or employ any person who is or may be likely to be in possession of any Confidential Information. Plaintiffs' Exhibit B at § 8.1.

As part of the agreement, Barnes acknowledged that he gave "careful consideration to the restraints imposed upon him . . . and is in full accord as to the necessity of such provisions as reasonable and proper protection of the Company's interests and [that] the restraints imposed upon him . . . are reasonable with respect to subject matter, time period and geographical

area." Plaintiffs' Exhibit B at § 8.3. The parties agreed that if a court or other authority refused to enforce the covenants of their agreement, because they "cover too extensive a geographic area or too long a period of time, any such covenant shall be deemed appropriately amended and modified in keeping with the intention of the parties to the maximum extent permitted by law." Plaintiffs' Exhibit B at § 8.2.

On a weekend in November of 2002, just over a year after the sale of Rehab Associates, Barnes, Millington, Yake, and Mike Ellis met at Barnes's home to discuss the option of forming a new company. At this meeting, Barnes indicated that he would not participate "until at least sometime in the future." Millington Deposition at p. 133, lines 11–14. Barnes, nevertheless, was involved in the selection of the name Rehab Solutions and in retaining Kyle Johnson for legal assistance in forming the new corporation.

In January of 2003, Rehab Solutions, LLC was formed. Its stated purposes include engaging "in all aspects of the business of providing rehabilitative services ...." Plaintiffs' Exhibit 111 attached to Barnes's Deposition. The 2003 Alabama Department of Revenue Alabama Business Privilege Tax Return and Annual Report for Rehab Solutions lists Rocky Barnes as the primary member/partner or President, as the corporation's registered agent, and provides his home address as the principal place of business. Barnes denies signing this document; however, it is undisputed that Barnes provided a personal check for one hundred dollars to pay the required tax/filing fee for Rehab Solutions. Cards were printed that referred to Barnes as the chairman of the company. E-mail addresses were created, including one for Barnes with the name Rehab Solutions included in the address.

An important part of Barnes's job was to help grow Rehab Associates, Benchmark's recent acquisition, through his contacts, particularly in the Southeast. Barnes met Mike Zucker through a hospital in Rome, Georgia, where he was working as an operating officer with responsibility for the physical therapy department. Rehab Associates provided services to this hospital. Zucker eventually moved to Chicago, where he began working for the Chicago Institute of Neurology and Neurosurgery. Zucker contacted Barnes looking for "the standard physical therapy type of services that a hospital would offer." Barnes's Deposition, at p. 72, lines 4–6. Barnes told Ellis, Millington, and Yake about this opportunity, but failed to alert Benchmark. In January of 2003, Barnes flew to Chicago with Yake in order to introduce him to Zucker, who informed them that he decided to leave his employer. Therefore, Stephanie Spiegel would be the person that they would need to contact. In February of 2003, Barnes and Yake went back to Chicago to pitch Spiegel on Rehab Solutions' proposal to manage the rehabilitation services for the Chicago based facility.

In March or April of 2003, Barnes aided Yake in networking with Mike McNair, a hospital administrator for Lakeview Hospital in Eufaula, Alabama. Barnes introduced Yake to McNair and discussed with McNair the possibility of working with Rehab Solutions for its rehabilitative services. After turning the discussions of pursuing a business relationship with Lakeview Hospital over to Yake, Barnes still "would talk to McNair from time to time to see how things were progressing." Barnes's Deposition, at p. 116, lines 22–23.[3] Barnes also

---

3. In preparing for a contract with Lakeview Hospital, Rehab Solutions submitted a provid-

er application form to obtain reimbursement for physical therapy services from health in-

alerted Yake to an opportunity with Lake Martin Physical Therapy, one of Benchmark's existing customers. Barnes was initially responsible for Benchmark obtaining a contract with Lake Martin Physical Therapy; however, he later allegedly called Yake informing him of a potential opportunity for Rehab Solutions. Barnes told Yake that dissatisfaction existed at Lake Martin with Benchmark. Barnes also became aware of a potential opportunity to provide rehabilitative services to a hospital in San Antonio. He discussed with hospital administrator Mark Clayton the possibility of Yake and Rehab Solutions providing these services; Barnes did not alert Benchmark about this opportunity.

A Rehab Solutions Board meeting was held in September of 2003 at Barnes's lake home. Barnes, Millington, and Yake were present at the meeting. They discussed the performance of the operations in Eufaula and at Lake Martin Physical Therapy. They discussed plans for expanding their enterprises and for hiring additional physical therapists.

Barnes also contacted Millington to inform him of an additional opportunity with the Edge Medical Center in Troy, Alabama, which was a customer of Benchmark. Barnes informed Millington that Benchmark could not meet its obligations for inpatient and home health services and that an opportunity might exist for Rehab Solutions to provide those services.

Barnes was originally responsible for Benchmark obtaining a contract with the Edge Medical Center in June of 2003. When Barnes learned that Ben Busby, a new hospital administrator, was going to be there, Barnes contacted him and eventually was able to enter into a business relationship for Benchmark to provide "home health, inpatient, and . . . a limited amount of outpatient for those Medicaid patients." Barnes's Deposition at p. 164, lines 10–12. By September of that year, Barnes was involved with Rehab Solutions becoming aware of, making a connection with, and pursuing a contract to provide inpatient and home health rehabilitative services for the Edge Medical Center.

## IV. *DISCUSSION*

The court's discussion addresses the remaining claims against Defendant Barnes, including Count III (breach of the asset purchase agreement), Count IV (breach of the employment agreement), Count VI (breach of fiduciary duty), and Count VII (tortious interference with contract).

### A. Breach of the Asset Purchase Agreement and Breach of the Employment Agreement

#### 1. Applying Alabama and/or Pennsylvania Law

 When a federal court decides a state law claim, whether acting pursuant to

surance companies. Stephanie Nard, who completed the form, listed Barnes as one of the "major shareholder(s), proprietor(s), or partner(s)" in Rehab Solutions. Plaintiffs' Exhibit 78 attached to Yake's Deposition. Yake states that he did not read the form before signing it and that Nard was mistaken in listing Barnes as being a major shareholder, proprietor, or partner. The Defendant requests that this Exhibit (Plaintiffs' Exhibit 78) be struck or alternatively argues pursuant to Fed. R. Civ. P. 56(e) that because it is

inadmissible hearsay the exhibit should not be considered by the court. With this issue arising in the Defendant's Reply Brief and because this evidence does not alter the court's conclusion regarding the Defendant's Motion for Summary Judgment, the court refrains from considering this evidence, but reaches no conclusion as to its admissibility. If the Defendant believes this evidence should be excluded at trial, the court will consider a motion in limine.

diversity or supplemental jurisdiction, it applies the choice-of-law rules of the jurisdiction in which its sits. *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 135 F.3d 750, 752 (11th Cir.1998) ("Federal courts sitting in diversity apply the forum state's choice-of-law rules."); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir.1996) (stating that federal courts should when exercising jurisdiction over pendent state claims and in diversity cases apply the forum state's choice of law provisions); *Ideal Electronic Sec. Co., Inc. v. International Fidelity Ins. Co.* 129 F.3d 143, 148 (D.C.Cir.1997). Thus, this court applies Alabama choice of law provisions, pursuant to which "a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction." *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 506 (Ala. 1991) (citing *Macey v. Crum*, 249 Ala. 249, 30 So.2d 666 (1947); *J.R. Watkins Co. v. Hill*, 214 Ala. 507, 108 So. 244 (1926)). The Alabama Supreme Court indicated that the State of Alabama "has long recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement." *Cherry, Bekaert & Holland*, 582 So.2d at 506. Nevertheless, "[w]hile parties normally are allowed to choose another state's laws to govern an agreement, where application of that other state's laws would be contrary to Alabama policy, the parties' choice of law will not be given effect and Alabama law will govern the agreement." *Id.* at 507. To resolve such conflicts of laws questions, Alabama appellate courts have applied the choice of law approach set forth by the United States District Court for the Southern District of Alabama in *Blalock v. Perfect Subscription Co.*, 458 F.Supp. 123 (S.D.Ala. 1978). *Id.* at 506.

The *Blalock* court cited and adopted the approach set forth by the Restatement (Second) of Conflicts of Law. *Blalock*, 458 F.Supp. at 127. Section 187 of the Restatement provides as follows:

(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

In *Blalock*, the court concluded that "section 187(2)(b) clearly requires this Court to refuse enforcement of the anticompetition covenant since it flies directly in the face of the public policy of Alabama as set out by statute, and since the Court concludes that Alabama law would be applicable but for the contractual choice of Pennsylvania." *Blalock*, 458 F.Supp. at 127. The Restatement specifies that:

When application of chosen law would be contrary to fundamental policy of state of otherwise applicable law. Fulfillment of the parties' expectations is not the only value in contract law; regard must also be had for state interests and for state regulation. The chosen law should not be applied without regard for the interests of the state which would be the state of the applicable law with respect to the particular issue involved in the absence of an effective choice by the parties. The forum will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law of the state of the otherwise applicable law. Application of the chosen law will be refused only (1) to protect a fundamental policy of the state which, under the rule of § 188, would be the state of the otherwise applicable law, provided (2) that this state has a materially greater interest than the state of the chosen law in the determination of the particular issue.

RESTATEMENT (SECOND) CONFLICT OF LAWS § 187 cmt. g (1971).

■■■ The Alabama Supreme Court found that "Alabama's policy against covenants not to compete is a fundamental public policy ...." *Cherry, Bekaert & Holland,* 582 So.2d at 507. Thus, where Alabama law would be applicable, but for the parties' selection of another state's law, and where Alabama has a greater material interest, notably a covenant that is to be enforced in Alabama and against an Alabama resident, Alabama courts will not apply another state's law, if the covenant not to compete is void under Alabama law. *Id.* at 507; *see also Unisource Worldwide, Inc. v. South Central Alabama Supply, LLC,* 199 F.Supp.2d 1194, 1201–02

(M.D.Ala.2001). If the covenants not to compete, both the Employment Agreement, which pursuant to the contract is governed by the Alabama law, and the Purchase Agreement, which under the contract is governed by Pennsylvania law, are void under Alabama law, then the covenant not to compete contained in the Purchase Agreement being valid under Pennsylvania law is irrelevant. The court will apply Alabama law.

2. Non–Compete Agreements and Professionals under Alabama Law

Alabama law provides as follows:

(a) Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void.

(b) One who sells the good will of a business may agree with the buyer and one who is employed as an agent, servant or employee may agree with his employer to refrain from carrying on or engaging in a similar business and from soliciting old customers of such employer within a specified county, city, or part thereof so long as the buyer, or any person deriving title to the good will from him, or employer carries on a like business therein.

(c) Upon or in anticipation of a dissolution of the partnership, partners may agree that none of them will carry on a similar business within the same county, city or town, or within a specified part thereof, where the partnership business has been transacted.

ALA. CODE § 8–1–1 (1975).

■■■ Under Alabama law, an agreement not to compete that restrains the practice

of a lawful business or trade can only be enforced if the party seeking to uphold the provision meets the burden of demonstrating that the non-competition agreement, pursuant to Section 8–1–1(a), is not void. *Constr. Materials, Ltd., Inc. v. Kirkpatrick Concrete, Inc.*, 631 So.2d 1006, 1009 (Ala.1994); *Orkin Exterminating Co. v. Etheridge*, 582 So.2d 1102, 1104 (Ala.1991). Section 8–1–1(a) provides for a general prohibition on covenants not to compete subject only to the limited exceptions provided by sub-sections (b) and (c) of Section 8–1–1. *Cherry, Bekaert & Holland v. Brown*, 582 So.2d 502, 505 (Ala.1991). "Although the remaining subsections of § 8–1–1 provide for exceptions to the general rule, including an exception for the sale of the good will of a business, this Court has stated on numerous occasions that a 'professional' cannot fall within these statutory exceptions." *Friddle v. Raymond*, 575 So.2d 1038, 1040 (Ala.1991) (citing *Wyatt Safety Supply, Inc. v. Indus. Safety Prods., Inc.*, 566 So.2d 728, 730 (Ala.1990); *Thompson v. Wiik, Reimer & Sweet*, 391 So.2d 1016, 1019–20 (Ala.1980); *Gant v. Warr*, 286 Ala. 387, 240 So.2d 353, 355–56 (1970); *Odess v. Taylor*, 282 Ala. 389, 211 So.2d 805, 811–12 (1968)).

The Alabama Supreme Court has stated that "[n]o better statement of the difference between engaging in a profession, as distinguished from a trade or business, can be found than the following observation made by the late Dean Roscoe Pound in his work *The Lawyer from Antiquity to Modern Times* . . . ." Pound explained:

"There is much more in a profession than a traditionally dignified calling. The term refers to a group of [people] pursuing a learned art as a common calling in the spirit of a public service— no less a public service because it may incidentally be a means of livelihood. Pursuit of the learned art is the purpose. Gaining a livelihood is incidental, whereas, in a business or trade it is the entire purpose." *Odess*, 211 So.2d at 812.

The Alabama Supreme Court has "stated several relevant factors to be considered in resolving the issue as to what constitutes a profession: professional training, skill, and experience required to perform certain services; delicate nature of the services offered; and the ability and need to make instantaneous decisions." *Friddle*, 575 So.2d at 1039. For purposes of non-competition agreements, under Alabama law, doctors, lawyers, accountants, and veterinarians are all professionals. *Pitney Bowes, Inc. v. Berney Office Solutions*, 823 So.2d 659, 665 (Ala.2001); *Odess*, 211 So.2d at 811–12. In analyzing whether veterinarians are professionals, the Alabama Supreme Court noted that "Ala.Code 1975, §§ 34–29–60 through –94, governs the practice of veterinary medicine and provides specific qualifications required of licensed veterinarians, referred to as 'professional qualifications.' " *Friddle*, 575 So.2d at 1040. The Court "[c]onsidering the knowledge, skill, and education required of licensed veterinarians, as well as their duty to promote the public health, safety, and welfare of the State of Alabama, consider[s] it apparent that the legislature intended that persons licensed to participate in the practice of veterinary medicine be considered professionals." *Id.* (citing ALA. CODE § 34–29–62). The court noted that "it is likewise [the court's] view that persons who practice the science of veterinary medicine are members of a profession." *Id.*

In a specially concurring opinion in *Burkett v. Adams*, 361 So.2d 1 (Ala.1978) (wherein the Alabama Supreme Court

found public accountants to be professionals for purposes of non-compete agreements), then Alabama Supreme Court Chief Justice Torbert wrote:

> Although the majority opinion makes reference to a statutory procedure of certification and licensing, I do not believe this court to be bound by this fact, nor by the mere fact that a particular occupation may be characterized as "professional" in a statute. All occupations seek to improve their standards through licensing and certification procedures, but I do not believe that all would reach the "professional" status insofar as voiding a covenant by a seller of the good will of the business to refrain from competing with his purchaser. *Id.* at 3.

Drawing upon Chief Justice Torbert's concurrence, the Alabama Court of Civil Appeals noted that "[t]here are multitudes of businesses, but few professions." *Dobbins v. Getz Exterminators of Alabama, Inc.,* 382 So.2d 1135, 1137 (Ala.Civ.App. 1980). The court found that even though the former employees for an extermination service "may be professionals in their business in the sense that they may have worthily attained excellence as to knowledge, skill, training, expertise, proficiency and experience in the pest control field; ... this would not convert their pest control business into a profession." *Id.* Nor was the court persuaded by a statutory reference to such business enterprises as "professional services," for "the word 'profession' so used in said § 8–1–1 means much more than such terms utilized in said Title 2, Chapter 28." *Id.*

The parties agree that the Alabama appellate courts have not addressed the specific issue of whether a physical therapist is a professional for purposes of non-competition agreements. They raise interesting arguments as to why this court should conclude that a physical therapist is or alternatively is not a professional with regard to non-compete agreements under Alabama law. It is not necessary, however, for the court to resolve this issue in order to reach a conclusion regarding Barnes's Motion for Summary Judgment on the Plaintiffs' claims for breach of the purchase agreement and breach of his employment agreement. The court instead concludes that granting summary judgment would be improper on narrower grounds.

 The purpose of Alabama freeing professionals from the restraints of non-compete agreements is that such restrictions are contrary to the public's interest. *See Odess,* 211 So.2d at 810. In creating this exclusion, the courts have "noted that an important distinction must be drawn between the **practice** of a profession and the transaction of other types of businesses." *Thompson,* 391 So.2d at 1020 (emphasis added). Restrictions that tend to deny the public in the affected area access to a trained professional have repeatedly been struck down by the courts as unenforceable on public policy grounds. *Anniston Urologic Associates, P.C. v. Kline,* 689 So.2d 54, 60 (Ala.1997). The Alabama Courts are not creating a status protection that turns professionals into a sort of protected class that may enter into and then disregard non-compete agreements; rather, the Alabama courts are preventing non-compete agreements from restricting professionals from providing their services to the public. *See id.* In other words, a doctor is not protected from the restraints of a non-compete agreement simply because he is a doctor. If so, if he were selling a restaurant, the restriction

would apply. A doctor is instead protected in his practice of medicine. This case presents a more complicated situation because Barnes remained involved in physical therapy as a business, but the parties disagree as to whether he continued to function as a physical therapist.

■ The Plaintiffs in their Complaint alleged that "[a]s Regional Vice President for [Benchmark], Barnes had overall management and supervisory responsibility for the business of [Benchmark's] subsidiary, Rehab Associates. His job responsibilities with [Benchmark] were exclusively managerial and executive in nature; he was not responsible for providing patient care." Complaint at ¶ 18. In his Answer, Barnes "admits the material allegations of Paragraph 18 except he denies that he had overall management and supervisory responsibility for Rehab Associates throughout his employment." Answer at ¶ 9. Nevertheless, Barnes in brief insists that he "was directly involved in the practice of physical therapy in his oversight and supervision of BMI's clinical operations in Alabama." Barnes's Brief at p. 22. This statement, however, is not supported through any citation. *Id.* The court's review of the facts presented by Barnes provide a detailed description of what a

physical therapist in general does in caring for a patient, but do not provide an indication of how Barnes in particular was involved in providing these services to the public.[4] Benchmark portrays Barnes as wholly separated from patient care, simply pursuing additional business opportunities and helping to maintain existing relationships on behalf of his employer. The Plaintiffs argue that at some point Barnes's efforts turned against them in the direction of pursuing opportunities for Rehab Solutions, an alleged competitor of Benchmark's Rehab Associates. Viewing the facts in the light most favorable to the Plaintiffs, Barnes was not and is not seeking to practice physical therapy, but instead is seeking to develop a corporate enterprise.[5] Just as a former practicing physician turned hospital administrator is not necessarily acting as a doctor, the Plaintiffs reasonably argue that simply because Barnes is registered as a physical therapist does not mean that he is acting as one. If Barnes is not acting as a physical therapist, then whether physical therapists are professionals or not, is immaterial.

3. Non–Compete Agreements and Reasonableness of the Area Restrictions

■ The Defendant argues that the parties' non-competition agreement is un-

4. In his Reply Brief, Barnes argues that "[i]n the day-to-day practice of physical therapy, a therapist has to function as a manager. As a licensed physical therapist in charge of clinical operations, Barnes was required to function as a physical therapist in managing the operations." Defendant's Reply Brief at § 4. Insofar as this is a fact based argument, the Defendant fails to provide any cited reference that supports the proposition that a manager/owner of a physical therapist must function as a physical therapist in performing his or her duties. Insofar as this is a logic based argument, the Defendant's contention is too broad and fails to provide the court with sufficient specifics as to what he means by functioning as a physical therapist. Further-

more, an added complication for Barnes is that for purposes of summary judgment analysis, viewing the evidence in the light most favorable to the non-movant Plaintiffs, Barnes was completely disconnected from patient care and not acting as a physical therapist.

5. It appears that under Alabama law a professional maintains the right to pursue in his professional capacity clients (patients, etc.); however, viewing the facts in the light most favorable to the Plaintiffs, it is not apparent to the court that Barnes is simply seeking to practice his profession and looking for patients.

enforceable because the scope of the limitation imposed upon Barnes is unreasonable in terms of time and place. Assuming that the non-competition agreement is not otherwise void, Alabama Courts will enforce the terms of a covenant not to compete if: (1) the employer has a protectable interest; (2) the restriction is reasonably related to that interest; (3) the restriction is reasonable in time and place; and (4) the restriction imposes no undue hardship on the employee. *James S. Kemper & Co. Southeast, Inc. v. Cox & Assocs., Inc.*, 434 So.2d 1380, 1384 (Ala.1983) (citing *DeVoe v. Cheatham*, 413 So.2d 1141, 1142 (Ala. 1982)); *see also Nationwide Mut. Ins. Co. v. Cornutt*, 907 F.2d 1085, 1087 (11th Cir. 1990); *Ex parte Caribe, U.S.A., Inc.*, 702 So.2d 1234, 1236 (Ala.1997). Under Alabama law, with regard to non-competition agreements, "[a]n unreasonable limitation or restriction may be stricken from the pertinent contractual provision, leaving the balance of the provision binding on the parties." *Cullman Broadcasting Co., Inc. v. Bosley*, 373 So.2d 830, 835 (Ala.1979); *see also Mason Corp. v. Kennedy*, 286 Ala. 639, 244 So.2d 585, 590 (1971) (holding that "a court of equity has the power to enforce a contract against competition although the territory or period stipulated may be unreasonable, by granting an injunction restraining the respondent from competing for a reasonable time and within a reasonable area.").

■ Barnes and Benchmark conceptualize the issue of reasonableness in two entirely different ways. Barnes discusses patients and how far they live from the clinics that they utilize. The Plaintiffs discuss their interest in terms of contacts, networking, and the possibility of expanding their business enterprises. The basic divide underlying the parties' differing conceptualizations is a divide over what constitutes the legitimate protectable interest, respectively in parties' purchase and employment agreements. The agreements between these parties can reasonably be interpreted as Benchmark purchasing the existing structure of Rehab Associates, its good name, and the efforts and contacts of Barnes in expanding Benchmark's acquisition beyond its existing structure.

■ The Alabama Supreme Court explained that "[w]here a sale of good will is involved, ... the buyer's interest in what he has acquired cannot be effectively realized unless the seller engages not to act so as unreasonably to diminish the value of what he has sold." *Greenlee v. Tuscaloosa Office Products and Supply, Inc.*, 474 So.2d 669, 671 (Ala.1985) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 188, cmt. b (1981)). Accordingly, "[t]he extent to which the restraint is needed to protect the promisee's interests will vary with the nature of the transaction." *Id.* What Barnes sold to the Plaintiffs, according to Benchmark, in addition to the existing Rehab Associates structure, is the possibility of expansion, the use of Barnes's networking skills and contacts, and his efforts at growing the company beyond what is was, into what it could be. In other words, the acquisition was not a static customer list, but a dynamic opportunity for growing and expanding. Whether the aforementioned can actually be purchased or sold is not fully explored by the parties in their briefs. Whether this is actually a protectable interest is not fully explored by the parties in their briefs. Viewing the facts in the light most favorable to the non-movant Plaintiffs and drawing reasonable inferences therefrom, the court for purposes of summary judgment analysis con-

cludes that the restraints on time and place are not necessarily unreasonable given what Benchmark argues it purchased.

Because Barnes has not demonstrated that he was acting as a professional or that the time and place restraints imposed upon him are unreasonable, the court cannot at this time find the non-compete agreement contained in the purchase and/or the employment agreement to be invalid. Viewing the facts in the light most favorable to the Plaintiffs, one could reasonably conclude that Barnes breached the purchase and employment agreements; therefore, his motion for Summary Judgment on the Plaintiffs' claims is due to be denied.

## B. Breach of fiduciary duty

Barnes contends that he is entitled to summary judgment on the Plaintiffs' claim for breach of fiduciary duty. The Defendant, citing *Massey v. Disc. Manufacturing, Inc.*, 601 So.2d 449 (Ala.1992), argues that "Alabama applies corporate domiciliary law to an action for the appropriation of corporate opportunity." Substitute Brief in Support of Defendant Rocky Barnes Motion for Summary ("Barnes's Summary Judgment Motion") at 30. He indicates that the Plaintiffs are domiciled in Delaware, thus Delaware law applies. The Plaintiffs do not dispute that Delaware law is applicable to their claim for breach of fiduciary duty. Plaintiffs' Opposition to Defendant Barnes's Motion for Summary Judgment at 21. The court for purposes of this summary judgment motion considers the Plaintiffs' claim for breach of fiduciary duty under Delaware law.

█ Barnes advances three arguments for why summary judgment is warranted: 1) he did not take advantage of these corporate opportunities for himself; 2) the "opportunities" identified by the Plaintiffs in Chicago, San Antonio, Lakeview Hospital, and Lake Martin Physical Therapy were not really opportunities that the Plaintiffs could have taken advantage of; and 3) the doctrine of wrongful appropriation of corporate opportunities applies only to corporate officers and directors, not employees. Viewing the facts in the light most favorable to the non-movant Plaintiffs and drawing reasonable inferences therefrom, problems emerge with all three of these arguments. Regarding Barnes's argument that he was not taking advantage of these opportunities for himself, the Plaintiffs present facts showing that Barnes was closely tied to Rehab Solutions in developing its business plan and as a prominent figure in advancing the cause of the newly formed corporation. Barnes argues that his involvement was in a considerably less significant role than that portrayed by the Plaintiffs, but for summary judgment purposes, the court cannot accept Barnes's interpretation. Rehab Solutions pursued these physical therapy opportunities. Viewing the facts in the light most favorable to the Plaintiffs and drawing reasonable inferences therefrom, Barnes advanced Rehab Solutions' cause with regard to these business opportunities in his own interest, which was tied with the newly formed Rehab Solutions.

█ Regarding Barnes's second argument, the Plaintiffs contend that in purchasing Rehab Associates from Barnes and employing him after the purchase, that his primary responsibility was to utilize his extensive contacts and relationships in the business of physical therapy to benefit his new employer. That Barnes, instead of pursuing opportunities on behalf of his employer Rehab Associates, helped Rehab

Solutions proved troublesome for the Plaintiffs. Nevertheless, Barnes insists that the Plaintiffs could not have benefitted or seized these opportunities, thus no harm befell them from his actions. While this is a possible interpretation of the facts, it is not the only reasonable one. Viewing the facts in the light most favorable to the Plaintiffs and drawing reasonable inferences therefrom, they could have benefitted from the opportunities in growing and expanding their business or maintaining existing relationships.

■■■ Barnes's third argument, that the doctrine of wrongful appropriation of corporate opportunity applies only to corporate officers or directors, is plagued by at least one, and possibly two additional problems. One problem with Barnes's argument is that his reading of Delaware law is too narrow. Simply because someone is an employee, rather than a corporate officer or director, does not, under Delaware law, exempt him from responsibility for breach of a fiduciary duty, including wrongful appropriation of a corporate opportunity. *Standard Chlorine of Delaware, Inc. v. Sinibaldi* 821 F.Supp. 232, 254 (D.Del.1992); *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962–65 (Del.1980).

■■■ "[A] mere employee, who is not an agent with respect to the matter under consideration, does not ordinarily occupy a position of trust and confidence toward his employer." *Standard Chlorine*, 821 F.Supp. at 254 (quoting *Brophy v. Cities Service Co.*, 70 A.2d 5, 7 (Del.Ch. 1949)). Drawing a distinction between an agent with respect to the matter under consideration and a mere employee, "Delaware law of corporate opportunity involves application of agency fiduciary law to a specific corporate fact scenario and 'sets the parameters of permissible employee conduct consistent with an employee's fiduciary duties to his employer of loyalty and fair dealing.' " *Standard Chlorine,* 821 F.Supp. at 254 (quoting *Science Accessories Corp.,* 425 A.2d at 964). Under Delaware law, limitations such as prohibitions on appropriating corporate opportunities extend beyond corporate officers and directors to key managerial personnel. *Science Accessories Corp.,* 425 A.2d at 962. In determining whether an employee can be held liable for breach of a fiduciary duty through appropriating a corporate opportunity, the court must under Delaware law look beyond a simple classification of someone as an employee, rather than a corporate officer or director, to focus on applying agency law to determine if they are liable. *Id.* at 962–65; *see also Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 599–601 (Iowa 1999) (providing a similar analysis of agency law generally and Iowa law specifically).

■■■ The fiduciary duties imposed upon an agent are good faith, loyalty, and fair dealing towards his or her principal. *Science Accessories Corp.,* 425 A.2d at 962 (citing RESTATEMENT (SECOND) OF AGENCY s 387 (1957)); *see also Gardner v. Cumis Ins. Soc., Inc.,* 582 So.2d 1094, 1096 (Ala. 1991) ("An agent is charged with a duty of good faith, loyalty and fair dealing. The principal-agent relationship is fiduciary by nature and imposes a duty of loyalty, good faith, and fair dealing on the part of the agent."). "Encompassed within such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him. There is also a corollary duty of an agent not to put himself in a position antagonistic to his principal concerning the subject matter of

his agency." *Id.* (citing RESTATEMENT (SECOND) OF AGENCY §§ 381; 393 (1957)). The Plaintiffs assert that Barnes, their agent, put himself in antagonistic position relating to the primary purpose of his employment, expanding the Plaintiffs' business through his contacts and networking skills.

■■■ That the scope of fiduciary duties of an agent to a principal supplies the contours for determining if Barnes is capable of wrongfully appropriating a corporate opportunity, raises a second problem with his argument that, as an employee, he is per se not liable. The Plaintiffs' complaint sets forth the contention that Barnes breached his duty of loyalty. Because Delaware law defines the scope of wrongful appropriation of a corporate opportunity as corresponding with the scope of breach of duty of loyalty as an agent, the practical significance of this is probably non-existent. When the Defendant attempts, however, to impose a bright line rule that one cannot be liable for usurpation of a corporate opportunity as an employee, a theory that the Plaintiff breached his duty of loyalty as an agent provides a means of avoiding such a bar and points out the practical problems with the limitation that the Defendant seeks to impose. The Defendant's bright line bar would, when a state's agency law and analysis of wrongful appropriation of a corporate opportunity mirror each other, do little more than provide a bar that a Plaintiff could

simply walk around by presenting his or her claim purely in terms of breach of the fiduciary duty of loyalty as an agent.[6]

A fact-finder could reasonably conclude that Barnes breached his fiduciary duty by wrongfully appropriating a corporate opportunity or reasonably find that Barnes failed to meet the required standards for duty of loyalty to a principal. Accordingly, his Motion for Summary Judgment is due to denied as to the Plaintiffs' claim for breach of fiduciary duty.

## C. Tortious Interference with Contract

■■■ Barnes argues that he is entitled to summary judgment on the Plaintiffs' claim that he tortiously interfered with contractual relations involving Benchmark and its customers. Under Alabama law, to establish the tort of interference with contractual or business relations, a plaintiff must prove: 1) the existence of a contract or business relation, 2) the defendant's knowledge of the contract or business relation, 3) intentional interference with the contract or business relation, 4) the absence of justification for the defendant's interference, and 5) damage to the plaintiff as a result of the interference. *Teitel v. Wal–Mart Stores, Inc.*, 287 F.Supp.2d 1268, 1279 (M.D.Ala.2003) (citing *Parsons v. Aaron*, 849 So.2d 932, 946 (Ala.2002)). "Justification has been recognized both as an element to be proved by

**6.** A third potential problem with Barnes's argument is that he may in fact be a corporate officer or director. The Plaintiffs point out that Barnes was elected to a position as Vice President of the Board of Rehab Associates; Barnes argues that this is a misrepresentation. Furthermore, he notes that he was never a board member or corporate officer of any of the named Plaintiffs, Benchmark Medical Holdings, Inc., Benchmark Medical Management Company, or Benchmark Acquisition

Corporation. He notes that "Rehab Associates is not a party plaintiff to this matter[;] therefore[,] any position Barnes may have had with Rehab Associates is irrelevant." Barnes's Reply at ¶ 2. Because Barnes is not entitled to summary judgment on the Plaintiffs' claim for breach of fiduciary duty, regardless of whether he is a corporate officer, the court references the parties' disagreement on this point, but reaches no conclusion.

the plaintiff and as an affirmative defense to be pleaded and proved by the defendant." *Parsons*, 849 So.2d at 946. Barnes contends that Benchmark's home office is to blame for their contractual problems with Lake Martin Physical Therapy and the Troy Regional Medical Center. He asserts that these contracts were terminated respectively because of the inability of Benchmark to provide home health and inpatient services and because of dissatisfaction with Benchmark's services and its lack of responsiveness. The Plaintiffs paint an extremely different picture, with Barnes failing to fulfill his duty to maintain Benchmark's relationship with Lake Martin Physical Therapy and the Troy Regional Medical Center, while working to assist Rehab Solutions to obtain a contract with these medical facilities. A multitude of disagreements arise between the parties as to what the facts are and even more so as to how those facts should be interpreted. They disagree as to the level of involvement that Barnes had in fostering a relationship between Rehab Solutions and medical facilities that had existing contracts with Benchmark, particularly with regard to Lake Martin Physical Therapy. They diverge over Barnes's intent in attempting to aid Rehab Solutions to obtain a contract with the Troy Regional Medical Center. Both parties offer reasonable but conflicting interpretations as to the cause of the termination of the Plaintiffs' contracts with these medical facilities. Viewing the facts in the light most favorable to the Plaintiffs, a fact-finder could reasonably conclude that Barnes committed the tort of intentional interference with contract, thus Barnes's Motion for Summary Judgment is due to be Denied.

## V. CONCLUSION

For the reasons discussed above, the Defendant's Motion for Summary Judgment is due to be Denied. Accordingly, it is hereby ORDERED as follows:

1) Defendant's Motion for Summary Judgment (Doc. # 80) is DENIED.

2) Plaintiffs' Claims for violation of Lanham Act (Count I) and violation of the Alabama Trade Secrets Act (Count II) are DISMISSED with prejudice.

3) Plaintiffs' Claims for breach of the non-competition agreements (Count V), which were brought exclusively against Quinn S. Millington and Dale M. Yake, are DISMISSED with prejudice.

4) The case will proceed against Defendant Glen "Rocky" Barnes on the Plaintiffs' claims for breach of the asset purchase agreement (Count III), breach of employment agreement (Count IV), breach of fiduciary duty (Count VI), and tortious interference with contract (Count VII).